[Cite as *State v. Wesson,* 137 Ohio St.3d 309, 2013-Ohio-4575.]

THE STATE OF OHIO, APPELLEE, *v*. WESSON, APPELLANT.

[Cite as *State v. Wesson,* 137 Ohio St.3d 309, 2013-Ohio-4575.]

*R.C. 2945.06—When a person charged with a capital offense waives a jury, the panel hearing the case shall be composed of three judges, two of whom shall be designated by the presiding judge or chief justice of the common pleas court, and if no one holds either position, then they shall be designated by the chief justice of the Supreme Court—Conviction for committing aggravated murder while under detention reversed— Conviction for committing aggravated murder during the course of an aggravated robbery affirmed—Death penalty affirmed.*

(No. 2009-0739—Submitted June 11, 2013—Decided October 23, 2013.)

APPEAL from the Court of Common Pleas of Summit County,

No. 2008-03-0710.

_____

**SYLLABUS OF THE COURT**

When a person charged with a capital offense waives a jury, the panel hearing the case shall be composed of three judges, two of whom shall be designated by the presiding judge or chief justice of the common pleas court, and if no one holds either position, then they shall be designated by the chief justice of the Supreme Court. (*State v. Eley,* 77 Ohio St.3d 174, 672 N.E.2d 640 (1996), clarified.)

_____

**O'DONNELL, J.**

{¶ 1} Hersie R. Wesson appeals from a judgment of a three-judge panel that convicted him of two counts of aggravated murder with death penalty specifications in connection with the death of Emil Varhola, two counts of

attempted murder in connection with the stabbing of Mary Varhola, two counts of aggravated robbery, and one count each of having a weapon while under a disability and tampering with evidence. The court merged allied offenses, imposed capital punishment for the aggravated murder of Emil Varhola while committing an aggravated robbery, and sentenced Wesson to an aggregate term of 26 years' imprisonment for the noncapital offenses.

{¶ 2} Count Three, aggravated murder, and one specification associated with Count Two, the other aggravated murder charge, required proof that Wesson was under detention at the time of the murder; but because the original sentencing entry that imposed postrelease control on Wesson placing him under detention is void, we reverse the convictions for Count Three, the specifications related to that count, and Specification One related to Count Two.

{¶ 3} However, we affirm the remaining convictions, including the aggravated murder conviction related to Count Two and its death penalty specification, the imposition of capital punishment, and the consecutive aggregate sentence of 26 years as imposed by the three-judge panel.

**Facts and Procedural History**

{¶ 4} On February 25, 2008, Wesson's girlfriend, Mildrian Ford, filed a police report against him following a dispute. Because Wesson was serving a three-year term of postrelease control following his release from prison in 2007, Ford also notified his parole officer, Julie Clark, of the incident. Clark, together with another parole officer and members of Akron's fugitive task force, began searching for Wesson.

{¶ 5} That evening, Wesson went to the home of 81-year-old Emil Varhola and his 77-year-old wife, Mary, who lived near Ford and knew Wesson from the neighborhood. Wesson sometimes talked to Emil, who occasionally gave him money or hired him to do odd jobs. Wesson knocked on their door and asked if he could come inside while he waited for Ford's bus to arrive, and they

accommodated him. Emil, who used a portable oxygen tank to breathe, offered Wesson coffee, and the two sat together at the kitchen table. Mary returned to the living room.

{¶ 6} Mary then heard a whistling sound coming from the kitchen. When she returned to the kitchen, she saw Emil lying on the floor in a pool of blood with the whistling sound coming from his windpipe and Wesson rifling through Emil's pockets. Mary confronted him, and he admitted that he killed Emil, and then he attacked her. He demanded "the gun," explaining that he needed it to kill his girlfriend. Mary refused to tell him where Emil kept his handgun, even as Wesson beat and stabbed her. According to Mary, he stopped assaulting her only when he thought she was dead.

{¶ 7} Wesson fled the home, taking a rifle and the cup from which he had drunk and throwing them in a bush in the front yard. He also took Mary's jewelry and Emil's wallet containing approximately $800.

{¶ 8} When he left, Mary contacted her son, Paul, who called 9-1-1 to report the incident. When officers arrived, they found Emil dead in the kitchen and Mary hardly able to stand or speak, but she was able to show police where Emil kept his pistol, in a hollowed-out book in the living room. She had multiple stab wounds on her chest and upper abdomen, bruises, and lacerations on her hands and fingers. Her right cheek had a large gash in it with the skin peeled back, exposing bone. Emergency personnel transported Mary to the hospital, where she lost consciousness and remained unconscious and on a respirator for more than a month before awaking.

{¶ 9} Officers found blood pooled on the kitchen floor, splattered on the curtains, smeared on the refrigerator, and splashed on the dining room wall and carpet. They noted other signs of a struggle, including objects strewn about and a set of dentures on the floor. The gun cabinet stood open, and one long gun appeared to be missing. Investigators did not find any weapon near Emil's body.

**{¶ 10}** Police followed a trail of bloody footprints leading to a bush in the front yard of the home, where they discovered Emil's long gun and the cup. They subsequently located Emil's wallet—which had no money in it—under the porch of a home several blocks away.

**{¶ 11}** Based on Mary's statements, the police began to look for Wesson. With Ford's assistance, officers located him at the Akron home of Christopher Conley, his cousin, in the early morning hours of February 26, 2008. On a dresser in the room where the police found Wesson, they discovered a straight-edged steak knife with what appeared to be dried blood on it. When they arrested Wesson, they observed blood-soaked bandages on his hands and what appeared to be blood on his sneakers and pants and on a jacket found in the room.

**{¶ 12}** At the police station, Wesson waived his *Miranda* rights, and two detectives interviewed him. He admitted stabbing Emil and Mary, but claimed that he acted in self-defense. He related that he and Mary had an ongoing sexual relationship and that Emil usually watched, but on this occasion he became upset watching them have unprotected sex on the kitchen floor. According to Wesson, Emil threatened him with a long gun and attacked him with a knife, but Wesson was able to disarm and stab Emil. Then, he claimed, he stabbed Mary after she hit him on the head with her cane. Based on Wesson's assertion that he had engaged in intercourse with Mary, investigators had the hospital perform a rape-kit examination on her, but samples tested negative for semen.

**{¶ 13}** An autopsy revealed that Emil had been stabbed eight times—four times in the torso, once in the neck, and three times in the back—and it revealed defensive wounds on his hands. Dorothy Dean, a deputy medical examiner for the Summit County Medical Examiner's Office, concluded that the stab wounds in Emil's neck and torso caused his death, and she testified that Emil's injuries could have been caused by the knife seized at the time of Wesson's arrest.

4

{¶ 14} A grand jury indicted Wesson for three counts of aggravated murder: aggravated murder with prior calculation and design, R.C. 2903.01(A); aggravated murder while committing aggravated robbery, R.C. 2903.01(B); and aggravated murder while under detention, R.C. 2903.01(D). Each count carried three capital specifications: aggravated murder while under detention, R.C. 2929.04(A)(4)(b); aggravated murder as "part of a course of conduct involving the purposeful killing of or attempt to kill two or more persons by the offender," R.C. 2929.04(A)(5); and aggravated murder while committing aggravated robbery, R.C. 2929.04(A)(7). The indictment also charged Wesson with three counts of attempted aggravated murder, two counts of attempted murder, three counts of aggravated robbery, one count of having weapons while under a disability, and one count of tampering with evidence.

{¶ 15} Wesson pled not guilty to all charges, waived his right to trial by jury, and elected to be tried by a three-judge panel. Notably, he did not object when the judge presiding over the trial appointed the other two members of the three-judge panel.

{¶ 16} Prior to trial, Wesson moved to suppress his statement to police, alleging that his intoxication at the time of questioning rendered his *Miranda* waiver invalid, that the warnings had not been properly given, and that police had coerced his statement. The court found, however, that he knowingly, intelligently, and voluntarily had waived his constitutional rights. Also, the state filed a motion in limine to exclude an audio recording that Wesson made retracting his statements to police; the trial court granted that motion and excluded the recording as hearsay.

{¶ 17} At trial, the state argued that Wesson came to the Varholas' home looking for a gun to kill his girlfriend and then murdered Emil and attempted to murder Mary. In contrast, the defense presented a theory of a friendly encounter that turned bad, stating that the Varholas had invited Wesson into their home so

he would not have to wait for a bus in the cold, but that Emil began to behave erratically, and Wesson, who knew that Emil owned guns, thought Emil had threatened him. Thus, the defense asserted that Wesson stabbed Emil in self-defense and assaulted Mary only when she attacked him with her cane.

{¶ 18} At the close of the state's case, the panel acquitted Wesson of aggravated murder with prior calculation and design.

{¶ 19} In Wesson's case-in-chief, the defense called a single witness, Akron Police Detective Joseph Urbank, who testified that he had interviewed a woman named Linda Fields about her observations of Wesson on February 25, the date of the murder. Fields died before trial, and by agreement of the parties, the defense played an audio recording of Urbank's interview with her. On the recording, she claimed that Wesson was at his cousin's residence, where she had been staying, from 5:00 p.m. until 8:00 p.m. on February 25. He left around 8:00 p.m. and did not return until 10:00 p.m. At that time, he had fresh cuts on his hands and she gave him bandages for the cuts. Fields also told Urbank that she had left the knife on the bedroom dresser earlier that afternoon.

{¶ 20} Following its deliberation on the case, the three-judge panel returned guilty verdicts on the remaining two counts of aggravated murder and on all three specifications for each count. In addition, the panel found Wesson guilty of two counts of attempted murder, two counts of aggravated robbery, one count of having a weapon while under a disability, and one count of tampering with evidence. The trial court merged the two aggravated murder convictions, the two attempted murder convictions, and the two aggravated robbery convictions. The state then elected to have Wesson sentenced for aggravated murder while committing aggravated robbery.

{¶ 21} After the sentencing hearing, the three-judge panel unanimously found that the aggravating circumstances outweighed the mitigating factors

6

beyond a reasonable doubt and sentenced Wesson to death for aggravated murder and to an aggregate term of 26 years in prison for the other convictions.

{¶ 22} On direct appeal to this court, Wesson presents 12 propositions of law.

## Law and Analysis

### *The Indictment*

{¶ 23} In proposition of law I, Wesson argues that his due process rights were violated because the indictment did not state the requisite mens rea for aggravated robbery in Count Two, which charged aggravated murder during the course of an aggravated robbery, R.C. 2903.01(B), Counts Seven and Thirteen, which charged aggravated robbery, R.C. 2911.01(A)(1) and (3), or the felony-murder specifications in Counts Two and Three that list aggravated robbery as the basis for the felony-murder specification, R.C. 2929.04(A)(7). But because he did not raise these objections at trial, Wesson has waived error. *State v. Horner*, 126 Ohio St.3d 466, 2010-Ohio-3830, 935 N.E.2d 26, ¶ 46 ("failure to timely object to a defect in an indictment constitutes a waiver of the error"). Thus, we conduct a plain-error analysis.

{¶ 24} Article I, Section 10, of the Ohio Constitution guarantees that "no person shall be held to answer for a capital, or otherwise infamous, crime, unless on presentment or indictment of a grand jury." As we recently explained in *Horner*,

> [t]he purpose of a grand jury indictment has always been to give notice to the accused: "[A] criminal offense must be charged with reasonable certainty in the indictment so as to apprise the defendant of that which he may expect to meet and be required to answer; so that the court and jury may know what they are to try,

7

and the court may determine without unreasonable difficulty what evidence is admissible."

*Id.* at ¶ 10, quoting *Horton v. State*, 85 Ohio St. 13, 19, 96 N.E. 797 (1911). Thus, we have recognized that even when an indictment fails to charge the mens rea of the offense, it is not defective as long as it "tracks the language of the criminal statute describing the offense," because that suffices to "provide[] the defendant with adequate notice of the charges against him." *Id.* at ¶ 45.

{¶ 25} In this case, Count Two of the indictment states:

> [The grand jurors find that] **HERSIE R. WESSON** * * * did commit the crime of **AGGRAVATED MURDER** in that he did purposely cause the death of Emil Varhola, while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit aggravated robbery, in violation of section 2903.01(B) of the Revised Code * * *.

(Capitalization and boldface sic.)

{¶ 26} Count Two identifies the mens rea for aggravated felony murder as "purposefully." *See State v. Fry*, 125 Ohio St.3d 163, 2010-Ohio-1017, 926 N.E.2d 1239, ¶ 40. It is unnecessary for this count to charge the elements of the predicate offense—aggravated robbery—because "it is the predicate offense itself and not the elements of the predicate offense that is an essential element of the charged offense." *State v. Buehner*, 110 Ohio St.3d 403, 2006-Ohio-4707, 853 N.E.2d 1162, ¶ 12. However, Wesson contends that the indictment for this count is defective because it names the predicate offense—aggravated robbery—without citing the Revised Code section for that offense. Yet he cites no authority for this proposition; moreover, the indictment charged aggravated robbery in Counts

Seven and Thirteen, and those counts do cite the code section. Thus, "[r]eading the felony-murder counts in pari materia with the related felony counts provided ample notification of the elements of the underlying felonies * * * that the state had to prove." *State v. Foust*, 105 Ohio St.3d 137, 2004-Ohio-7006, 823 N.E.2d 836, ¶ 29. The indictment therefore provided sufficient notice of the predicate offense charged in Count Two.

**{¶ 27}** Wesson also claims that the felony-murder specifications attached to Counts Two and Three alleging that Wesson was the principal offender of an aggravated murder while committing aggravated robbery should have charged the mental state of recklessness. However, as we explained in *Fry*, capital specifications provided in R.C. 2929.04(A)(7) "do[] not include a mens rea component." *Id.* at ¶ 51. Thus, this indictment is not defective.

**{¶ 28}** Regarding Count Seven, Wesson asserts that the indictment did not include the reckless mens rea for aggravated robbery, R.C. 2911.01(A)(1). Count Seven of the indictment states:

> [The grand jurors find that] **HERSIE R. WESSON** * * * did commit the crime of **AGGRAVATED ROBBERY** in that he did, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, have a deadly weapon, to wit: a knife, on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it, in violation of Section 2911.01(A)(1) of the Revised Code * * *.

(Capitalization and boldface sic.)

**{¶ 29}** Recklessness is not an element of the charged offense. R.C. 2911.01(A)(1) applies only to persons "attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code," and incorporates the mens rea of the underlying theft offense. *Horner*, 126 Ohio St.3d 466, 2010-Ohio-3830, 935 N.E.2d 26, at ¶ 49; *see also Buehner*, 110 Ohio St.3d 403, 2006-Ohio-4707, 853 N.E.2d 1162, at ¶ 10-12. And as we explained in *State v. Lester*, 123 Ohio St.3d 396, 2009-Ohio-4225, 916 N.E.2d 1038, ¶ 32-33, the mens rea of recklessness does not apply to the element of displaying, brandishing, indicating possession of, or using a deadly weapon, because the General Assembly imposed strict liability as to that element, and therefore "the state is not required to charge a mens rea for this element of the crime of aggravated robbery under R.C. 2911.01(A)(1)." In any case, because the indictment tracks the language of the criminal statute describing the offense, it provides adequate notice of the charges. *Horner* at ¶ 45.

**{¶ 30}** Wesson raises a similar objection to Count Thirteen of the indictment, which states:

> [The grand jurors find that] **HERSIE R. WESSON** * * * did commit the crime of **AGGRAVATED ROBBERY** in that he did, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, *recklessly* inflict, or attempt to inflict, serious physical harm on another, to wit: Emil Varhola and/or Mary Varhola, in violation of Section 2911.01(A)(3) of the Ohio Revised Code * * *.

(Capitalization and boldface sic; italics added for emphasis.)

{¶ 31} As discussed with regard to Count Seven, R.C. 2911.01(A)(3) applies only to persons "attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code," and R.C. 2911.01 thereby incorporates the mens rea of the underlying theft offense. But as to the element involving physical harm, Count Thirteen of the indictment tracks the language of the statute, and in any case, it identifies recklessness as the requisite mens rea.

{¶ 32} Hence, Wesson has failed to demonstrate plain error, and we therefore overrule this proposition of law.

### Miranda *Waiver*

{¶ 33} Proposition of law V argues that Wesson did not validly waive his rights in accordance with *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and therefore his motion to suppress his statement to the police should have been granted. Wesson received *Miranda* warnings and orally waived each *Miranda* right before making a statement to police. He nonetheless claims that "the combination of the lack of sleep, the alcohol, the coercive nature of the setting and defendant's lack of education combined to render [his] waiver invalid."

{¶ 34} When a suspect is questioned in a custodial setting, the Fifth Amendment requires that he receive *Miranda* warnings to protect against compelled self-incrimination. *Miranda* at 478-479. A suspect may then knowingly and intelligently waive these rights and agree to make a statement. *Id.* at 479. If a defendant later challenges a confession as involuntary, the state must prove a knowing, intelligent, and voluntary waiver by a preponderance of evidence. *See id*. at 475; *Colorado v. Connelly*, 479 U.S. 157, 168-169, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986).

{¶ 35} To determine whether a valid waiver occurred, we "consider the totality of the circumstances, including the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation;

the existence of physical deprivation or mistreatment; and the existence of threat or inducement." *State v. Edwards*, 49 Ohio St.2d 31, 358 N.E.2d 1051 (1976), paragraph two of the syllabus; *see also Arizona v. Fulminante*, 499 U.S. 279, 285, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). We have held that a waiver is not involuntary *unless* there is evidence of police coercion, such as physical abuse, threats, or deprivation of food, medical treatment, or sleep. *State v. Cooey*, 46 Ohio St.3d 20, 28, 544 N.E.2d 895 (1989).

{¶ 36} At the suppression hearing, the trial court heard testimony from an expert witness called by the defense, Dr. Robert Bellotto Jr., who used the Widmark Method to estimate Wesson's blood-alcohol level at the time of his statement based on information given to him by the defense. Some of the factors he considered included height, weight, age, gender, amount and type of alcohol and food consumed, alcohol-elimination rate, and history of alcohol use. Bellotto stated that a 50-year-old male chronic alcoholic who is five feet, seven inches tall and weighs 147 pounds, who consumed a large bottle of Mogen David wine (18 percent alcohol) and six to eight beers (5.5 percent alcohol) between early afternoon and 11:00 p.m., and who slept from approximately 11:15 p.m. to 3:15 a.m. would have a blood-alcohol level of .17 grams per deciliter at 4:00 a.m. But he conceded that he did not know how much alcohol or food Wesson had actually consumed on February 25 or Wesson's alcohol-elimination rate.

{¶ 37} During his testimony at the suppression hearing, Wesson claimed that he drank a "fifth" of Mogen David wine and a considerable amount of beer throughout the day on February 25, but that he did not drink any alcohol between 11:00 p.m. that evening, when he went to bed, and 4:00 a.m. the next morning, when police questioned him. He further claimed to have been intoxicated and falling from his chair during the interrogation.

{¶ 38} In response, the state presented testimony from four law enforcement officers who interacted with Wesson on the morning of February 26,

2008, each of whom testified that he did not observe any signs of intoxication or smell alcohol on his breath, and the three officers Wesson spoke to that morning testified that they did not detect any slurring of his speech. Wesson had had no trouble sitting upright or walking, and he responded appropriately to the questions asked. The officers who had questioned Wesson denied that he had fallen out of his seat during the interview. The state also presented the testimony of Steve Perch, a toxicologist from the Summit County Medical Examiner's Office, who questioned Bellotto's finding and stated that it would not be possible to correctly estimate Wesson's blood-alcohol level without knowing his elimination rate, his food consumption that day, or his typical alcohol consumption.

{¶ 39} The court denied the motion to suppress and found "the detectives' testimony credible and supported by the recording of [Wesson's] interview." After considering all the circumstances, the court determined that Wesson "made a knowing, voluntary, and intelligent waiver of his constitutional rights, and that his statement to police was voluntarily made."

{¶ 40} As we explained in *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, "[a]ppellate review of a motion to suppress presents a mixed question of law and fact. When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses." *Id.* at ¶ 8. And we also stated: "[A]n appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence. * * * Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." *Id.*

{¶ 41} Wesson argues that his intoxication, lack of sleep, and lack of education, in addition to the coercive nature of the interview setting, rendered the waiver of his constitutional rights invalid. Here, however, the trial court finding

that Wesson validly waived his *Miranda* rights is supported by competent and credible evidence, consisting of the testimony of the four police officers and the audio recording of Wesson's statement. Wesson's claim of a limited education may evidence "low mental aptitude," but that alone does not demonstrate involuntariness. *State v. Hill,* 64 Ohio St.3d 313, 318, 595 N.E.2d 884 (1992), citing *Connelly*, 479 U.S. at 164, 107 S.Ct. 515, 93 L.Ed.2d 473. Notably, Wesson's prior criminal record shows familiarity with the criminal process, and he himself recited the *Miranda* warnings at the suppression hearing. This record does not support his allegation of police coercion, as neither the audio recording of the statement nor the testimony from the suppression hearing indicates any physical abuse, threats, or efforts to deprive Wesson of food, medical treatment, or sleep. The actions of the detectives in seating him in a fixed chair and handcuffing him to a steel table in an interrogation room while they questioned him for less than one hour do not amount to police coercion. *See McCall v. Dutton*, 863 F.2d 454 (6th Cir.1988) (no coercion when officers handcuffed a defendant and placed him on the ground, then numerous armed officers surrounded and yelled at him); *State v. Brewer,* 48 Ohio St.3d 50, 58, 549 N.E.2d 491 (1990) ("find[ing] nothing improper in the 'length, intensity, and frequency' of the questioning" when there was no evidence of deprivation or mistreatment and "the actual interview took up only about three hours").

{¶ 42} Based on the totality of the circumstances presented here, Wesson validly waived his *Miranda* rights, and we reject this proposition of law.

### *Selection of the Three-Judge Panel*

{¶ 43} In proposition of law IV, Wesson argues that the trial court violated R.C. 2945.06 and his due process rights because Judge Teodosio, the judge assigned to hear Wesson's criminal trial, selected the other two judges who served on the three-judge panel that adjudicated his guilt and imposed sentence.

{¶ 44} R.C. 2945.06 provides the procedure for appointing judges when the accused in a death penalty case waives the right to trial by jury:

> [The accused] shall be tried by a court to be composed of three judges, consisting of the judge presiding at the time in the trial of criminal cases and two other judges to be designated by the presiding judge or chief justice of that court, and in case there is neither a presiding judge nor a chief justice, by the chief justice of the supreme court.

{¶ 45} Wesson waived his right to a jury trial and elected to have the case tried to a three-judge panel. After reviewing our decision in *State v. Eley,* 77 Ohio St.3d 174, 672 N.E.2d 640 (1996), Judge Teodosio concluded that as the judge presiding over the case, he had the authority to designate the other judges to serve on the panel. Wesson executed an amended written waiver, consenting to be tried by a panel "consisting of Judge Thomas A. Teodosio, presiding at this time, and two other judges to be designated pursuant to law." Judge Teodosio then appointed Judges Brenda Burnham Unruh and Robert M. Gippin to the panel and docketed a journal entry confirming that the court had constituted the panel as "selected and approved by counsel for Defendant." Wesson never objected to Judge Teodosio's decision to appoint the panel nor sought to withdraw the jury waiver.

{¶ 46} The term "presiding judge," as used in R.C. 2945.06, does not refer to the judge to whom a capital case has been assigned, but rather refers to the presiding judge of the common pleas court. The statute requires the court to be composed of three judges: the judge presiding at the time in the case and two others to be designated by the presiding judge or chief justice of the common pleas court, and when there is neither, then by the chief justice of the Supreme

Court.[1]  If the General Assembly had intended to allow the judge assigned to preside over a capital murder trial to appoint the other two judges of the three-judge panel, then there would be no need to designate the chief justice of the Supreme Court to appoint the judges when there is neither a presiding judge nor a chief justice of the common pleas court, because there would always be a judge presiding over the capital case.  Thus, the term "presiding judge," as used in R.C. 2945.06, does not refer to the judge presiding over the assigned capital case.  Instead, it refers to the judge who serves as the presiding judge over a multiple judge common pleas court.

{¶ 47} We realize that the trial court here reviewed and relied on our statement in *Eley*, paraphrasing R.C. 2945.06 as "provid[ing] that the three-judge panel is to be composed of three judges: the judge presiding at the time in the trial of criminal cases and two judges to be designated by that judge or by the presiding judge or chief justice of that court." *Id.* at 184.  However, that language is dicta, as *Eley* presented no question regarding the authority to appoint members of the three-judge panel, and it is inconsistent with the plain meaning of R.C. 2945.06.  We disavow our statement in *Eley* that the judge presiding over the capital case may designate the other two judges, and we clarify that when a person charged with a capital offense waives a jury, the panel hearing the case shall be composed of three judges, two of whom shall be designated by the presiding judge or the chief justice of the common pleas court, and if no one holds either position, then they shall be designated by the chief justice of the Supreme Court.

---

1. Ohio law provided for common pleas courts to select a chief justice of the court until 1995.  *See* Sub.H.B. No. 151, 146 Ohio Laws, Part II, 2177 (an act "to repeal section 2301.04 of the Revised Code to eliminate the authority of a court of common pleas with more than two judges to designate one of their number as the chief justice of the court").  The current Ohio Rules of Superintendence provide for common pleas courts to select a presiding judge, not a chief justice of the court.  Sup.R. 3.

**{¶ 48}** Accordingly, the judge presiding over Wesson's trial, who was neither the presiding judge nor the chief justice of the Summit County Common Pleas Court, lacked authority to designate the other two members of the panel.

**{¶ 49}** We have held that trial courts must strictly comply with R.C. 2945.06 and convene a three-judge panel when the accused in a capital case waives a jury. *See State v. Pless*, 74 Ohio St.3d 333, 658 N.E.2d 766 (1996), paragraph one of the syllabus (holding that the jury-waiver requirements in R.C. 2945.05 must be strictly observed); *Pratts v. Hurley*, 102 Ohio St.3d 81, 2004-Ohio-1980, 806 N.E.2d 992, ¶ 14 (requiring strict compliance with statutory procedures for three-judge panels). Further, in *Pratts*, we noted that strict compliance with the mandate for a three-judge panel may not be voluntarily waived and the failure to strictly comply with the mandate is always reversible error on direct appeal. *Id.* at ¶ 32.

**{¶ 50}** However, we have never held that error in the selection of the three-judge panel is per se reversible error nor that such an error could not be waived. Rather, we have recognized that not every trial court error in applying R.C. 2945.06 is automatically reversible error. In *State v. Turner*, 105 Ohio St.3d 331, 2005-Ohio-1938, 826 N.E.2d 266, for example, we considered the requirement that the three-judge panel "examine the witnesses" to determine the accused's guilt. There, the court had failed to comply with R.C. 2945.06, admitting evidence through agreed stipulations of facts rather than through live testimony, but we declined to hold that the error was reversible. Quoting our prior decision in *State v. Post*, 32 Ohio St.3d 380, 393, 513 N.E.2d 754 (1987), we explained:

> "Agreements, waivers and stipulations made by the accused, or by the accused's counsel in his presence, during the course of a criminal trial are binding and enforceable. * * *

17

> Although R.C. 2945.06 requires the court to 'examine the witnesses' in determining whether the accused is guilty of aggravated murder, we find that appellant was bound by the agreed-upon procedure wherein the state would proffer a statement of facts in lieu of witnesses or other evidence."

*Turner* at ¶ 41.

**{¶ 51}** Here, Wesson accepted the court's method of appointing the members of the three-judge panel. He executed an amended jury waiver in open court immediately after Judge Teodosio explained that he would designate the members of the panel, and the journal entry confirmed that the court had constituted the panel as "selected and approved by counsel for Defendant." And because Wesson never objected to the procedure followed by Judge Teodosio to select the panel members nor objected to the panel members, he has forfeited all but plain error.

**{¶ 52}** Reversal for plain error "is warranted only if the outcome of the trial clearly would have been different absent the error." *State v. Hill*, 92 Ohio St.3d 191, 203, 749 N.E.2d 274 (2001). But here, Wesson makes no argument— and therefore does not demonstrate—that the appointment of different members to the three-judge panel would have changed the outcome of the proceeding. Further, both of the panelists served as members of the Summit County Court of Common Pleas. Nothing suggests that either was ineligible or unqualified to hear the case.

**{¶ 53}** Because Wesson fails to demonstrate plain error, this proposition of law is not well taken.

***Right to Present a Complete Defense***

**{¶ 54}** Proposition of law III asserts that the trial court violated Wesson's due process rights when it refused to admit a recording of his retraction of the statement he made to police on the day of his arrest.

**{¶ 55}** When confronted by detectives, Wesson initially claimed that he and Mary had a sexual relationship, that Emil regularly watched them engage in intercourse, and that he and Mary were having sex when Emil became angry and threatened him with a gun and a knife. He further stated that in response to the threat, he stabbed Emil, and because Mary struck him with her cane, he also stabbed her.

**{¶ 56}** Prior to trial, defense counsel notified the court that Wesson "repudiates the statement made by him on the day of his arrest to Detective Harrah" and submitted an audio recording of the repudiation, asserting that the tape "call[ed] into question the admissibility of his arrest day statement" by proving that it was "untrustworthy and unreliable."

**{¶ 57}** The state moved to exclude the repudiation recording from trial, arguing that it constituted inadmissible hearsay. The trial court excluded the recording, concluding that Evid.R. 801(D)(2) does not permit a party to offer his *own* out-of-court statement as an admission by a party opponent.

**{¶ 58}** Wesson concedes that the Rules of Evidence bar admission of his repudiation. *See State v. Cunningham*, 105 Ohio St.3d 197, 2004-Ohio-7007, 824 N.E.2d 504, ¶ 105 ("A party may not introduce his own statement under Evid.R. 801(D)(2)(a)"); *In re Coy*, 67 Ohio St.3d 215, 218, 616 N.E.2d 1105 (1993). However, he asserts that applying the hearsay rule in these circumstances deprived him of the constitutional right to present a defense.

**{¶ 59}** "[T]he Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.' " *Crane v. Kentucky*, 476 U.S. 683, 690, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986), quoting *California v. Trombetta*, 467

U.S. 479, 485, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984). However, "[a] defendant's right to present relevant evidence is not unlimited, but rather is subject to reasonable restriction." *United States v. Scheffer*, 523 U.S. 303, 308, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998). And states have a legitimate interest in ensuring that triers of fact are presented with reliable evidence and have "broad latitude under the Constitution to establish rules excluding evidence from criminal trials" to further that goal. *Scheffer* at 308, 309. Such "rules do not abridge an accused's right to present a defense so long as they are not 'arbitrary' or 'disproportionate to the purposes they are designed to serve' " and if they do not "infringe[ ] upon a weighty interest of the accused." *Id.* at 308, quoting *Rock v. Arkansas*, 483 U.S. 44, 56, 58, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987).

{¶ 60} Ohio's rule excluding hearsay statements offered by a party to advance that party's own interests is neither arbitrary nor disproportionate. The general rule excluding hearsay, "which has long been recognized and respected by virtually every State," traditionally excludes "[o]ut-of-court statements * * * because they lack the conventional indicia of reliability: they are usually not made under oath or other circumstances that impress the speaker with the solemnity of his statements; the declarant's word is not subject to cross-examination; and he is not available in order that his demeanor and credibility may be assessed" by the trier of fact. *Chambers v. Mississippi*, 410 U.S. 284, 298, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), citing *California v. Green*, 399 U.S. 149, 158, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970). This rule is "based on experience and grounded in the notion that untrustworthy evidence should not be presented to the triers of fact," *id.*, and therefore, excluding self-serving hearsay statements that are not subject to cross-examination or made under circumstances ensuring their reliability is neither arbitrary nor disproportionate to the purposes the rule is designed to serve.

{¶ 61} In this case, Wesson has failed to demonstrate that applying the hearsay rule to his statement "infringed upon a weighty interest of the accused."

*Scheffer*, 523 U.S. at 308, 118 S.Ct. 1261, 140 L.Ed.2d 413. Although he asserts that excluding his repudiation undermined his ability to combat the prejudicial effect of his statement to police, he does not explain how it impaired his ability to offer any particular defense. Moreover, he could have repudiated his statement to police at trial, if he were willing to do so under oath and subject himself to cross-examination, but he chose not to do so, and he is precluded from introducing his own inadmissible hearsay repudiation as a substitute for that testimony.

{¶ 62} For these reasons, this proposition is not well taken.

### *Conviction for Committing Aggravated Murder While Under Detention*

{¶ 63} Proposition of law II asserts that Wesson's conviction for committing aggravated murder while under detention and his convictions for the specifications charging that he committed aggravated murder while under detention are invalid because the sentence imposing the postrelease control that caused him to be under detention is void.

{¶ 64} At trial, the state proved that Wesson had been convicted in 2003 of burglary, violating a protection order, criminal damaging or endangering, and domestic violence. Pursuant to R.C. 2967.28(B)(2), Wesson's conviction for burglary, a second-degree felony, required the trial court to impose a prison sentence and a mandatory three-year term of postrelease control, but the trial court mistakenly sentenced him to a three-year discretionary term of postrelease control to be served at the discretion of the Adult Parole Authority. In May 2007, the Adult Parole Authority released him from prison subject to a three-year term of postrelease control.

{¶ 65} Within a year of his release, Wesson murdered Emil, and the state charged him with committing aggravated murder while under detention. Relying on the 2003 sentencing entry and Wesson's postrelease-control order, the three-judge panel found Wesson guilty of committing aggravated murder while under detention (Count Three) and of two specifications for committing aggravated

murder while under detention (Specification One to Count Two and Specification One to Count Three).

{¶ 66} In *State v. Billiter*, 134 Ohio St.3d 103, 2012-Ohio-5144, 980 N.E.2d 960, we concluded that an offender could not be convicted of escape when his term of postrelease control was void. In that case, Billiter had been convicted of aggravated burglary and domestic violence and sentenced to imprisonment and postrelease control in 1998. After he served his prison term and the Adult Parole Authority placed him on postrelease control, Billiter violated the terms of his release, and he subsequently pled guilty to escape in 2004. He did not appeal, but in 2010, he filed a motion to vacate the escape conviction, seeking to invalidate his 2004 guilty plea because his 1998 postrelease-control sentence was void. The trial court denied the motion and the court of appeals affirmed.

{¶ 67} Reversing the appellate court, we held that Billiter's 1998 sentence was void because it imposed an incorrect term of postrelease control, that "[t]he trial court's incorrect sentence for postrelease control in 1998 was insufficient to confer authority upon the Adult Parole Authority to impose up to three years of postrelease control on Billiter," *id.* at ¶ 12, and that he "[was] not barred by res judicata from arguing that his plea [to the escape charge] is void," *id.* at ¶ 13.

{¶ 68} Here, Wesson's 2003 sentence failed to impose a mandatory three-year term of postrelease control, and so that part of the 2003 sentence is void. *See* R.C. 2967.28(B)(2); *Billiter* at ¶ 12; *State v. Fischer*, 128 Ohio St.3d 92, 2010-Ohio-6238, 942 N.E.2d 332, ¶ 26. Accordingly, pursuant to *Billiter*, we reverse the conviction for (1) Count Three, (2) the specifications to Count Three, and (3) the specification to Count Two that Wesson committed aggravated murder while under detention. For the reasons explained in our independent sentencing evaluation below, Wesson's sentence of death for Count Two is unaffected by this disposition.

*Allied Offenses*

{¶ 69} Proposition of law VI contends that aggravated robbery (Count Seven) and tampering with evidence (Count Ten) are allied offenses of similar import because both involved Wesson's carrying a gun and a cup out of the Varholas' house and discarding them in the bushes in the front of the house. According to Wesson, his "animus for taking the items from the house was the same as the animus for making these items unavailable to the prosecution." The trial court sentenced Wesson to nine years for the robbery conviction and four years for tampering with evidence, to be served consecutively.

{¶ 70} R.C. 2941.25(A) states: "Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one." But pursuant to R.C. 2941.25(B), "where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them." Thus, as we explained in *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, 942 N.E.2d 1061, "[w]hen determining whether two offenses are allied offenses of similar import subject to merger under R.C. 2941.25, the conduct of the accused must be considered." *Id.* at the syllabus.

{¶ 71} Wesson's allied offenses claim fails because the same conduct is not the basis of both convictions. Wesson tampered with evidence when he removed the cup and the long gun from the Varhola home and concealed them in the bushes. He committed other conduct supporting the aggravated robbery conviction when he stole Emil's wallet and Mary's jewelry. Notably, the trial court referred to the stolen wallet when discussing the aggravating circumstance of the aggravated robbery in its sentencing opinion.

**{¶ 72}** Because the aggravated robbery and the tampering with evidence involve separate conduct and different property, they are not allied offenses and Wesson can be separately sentenced on each conviction. We therefore reject this proposition of law.

### *Victim-Impact Statements*

**{¶ 73}** In proposition of law VII, Wesson claims that his Eighth Amendment rights were violated by the introduction of four victim-impact statements that were given before the trial court issued its sentencing opinion.

**{¶ 74}** The Eighth Amendment does not bar the admission of victim-impact evidence. *Payne v. Tennessee*, 501 U.S. 808, 827, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). Rather, as the court explained in *Payne*, each "[s]tate may legitimately conclude that evidence about the victim and about the impact of [a] murder on the victim's family is relevant to the [fact-finder's] decision as to whether or not the death penalty should be imposed." *Id.* And in *State v. Smith*, 97 Ohio St.3d 367, 2002-Ohio-6659, 780 N.E.2d 221, we held: "Victim-impact evidence is permitted where it elicits the effect that the victim's death has had on family members. * * * However, victim-impact evidence that expresses an opinion as to the appropriate sentence to be imposed is inappropriate." *Id.* at ¶ 65.

**{¶ 75}** In this case, Paul Varhola's statement reflected on his father's military service and character, the heinous nature of the crime, and the impact that his mother's injuries had on the family. His wife explained the impact of the crime on her family, described Wesson as having taken advantage of Emil's friendship and generosity, and expressed her wish that Wesson be sentenced to death so he could not hurt anyone else. The victims' nephew, Dennis Woods, explained how Emil's murder and Mary's injuries had affected their family, neighbors, and friends. Woods called Wesson a liar, "a menace to society," "a pathetic coward with no respect for human life," and among "the worst scum of any society" because he "prey[s] on the weak and the defenseless." Woods said

that it had been proved "beyond a shadow of a doubt that justice can only be served if Hersie R. Wesson is sentenced to death." And in a recorded statement, Mary described Wesson as a liar who took advantage of her husband, explained how the crime had ruined her finances and home, and expressed her wish that the court sentence Wesson to death.

{¶ 76} The foregoing demonstrates that the trial court improperly permitted statements about punishment for the crime, specifically, statements recommending that capital punishment be imposed; however, these statements were presented to a three-judge panel, not a jury, and we have recognized that when an improper victim-impact statement is conveyed only to judges, "it is not reversible error unless there is some indication that the judge actually considered it in sentencing the defendant to death." *State v. Franklin*, 97 Ohio St.3d 1, 2002-Ohio-5304, 776 N.E.2d 26, ¶ 88.

{¶ 77} Nothing in this record suggests that the panel relied on the victim-impact statements in reaching its sentencing decision, and Wesson admits that the sentencing opinion does not refer to the victim-impact statements. *See State v. Goodwin*, 84 Ohio St.3d 331, 343, 703 N.E.2d 1251 (1999) (finding no improper influence where the judge heard an improper victim-impact statement but the sentencing opinion did not refer to the statement); *State v. Treesh*, 90 Ohio St.3d 460, 489, 739 N.E.2d 749 (2001) (holding that no reversible error occurred where the court did not refer to the "improper sentencing recommendation either orally at sentencing or in the court's written sentencing opinion"). Notably, here, the victim-impact statements were presented to the court only after the panel had decided to impose a death sentence and had announced that it "unanimously finds by proof beyond a reasonable doubt, that the aggravating circumstances the Defendant was found guilty of committing outweighed the mitigating factors."

{¶ 78} Wesson asserts that because the panel was authorized to change its sentencing decision after hearing the victim-impact statements, it may have been

improperly influenced by the statements into maintaining its original decision. This speculation does not show improper influence, and Wesson points to nothing demonstrating that the statements affected the decision to impose capital punishment. Thus, as we explained in *State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, when there is no indication that the trial court considered the victim-impact statements in arriving at its sentencing decision, " '[t]his court will presume that a trial court considered only the relevant, material, and competent evidence in arriving at its judgment.' " *Id.* at ¶ 148, quoting *State v. Myers,* 97 Ohio St.3d 335, 2002-Ohio-6658, 780 N.E.2d 186, ¶ 131.

{¶ 79} Therefore, this proposition lacks merit.

### *Ineffective Assistance of Counsel*

{¶ 80} In proposition of law VIII, Wesson claims ineffective assistance of counsel during the guilt phase of the trial. He identifies five instances of allegedly deficient performance, each of which recasts one of his substantive propositions of law as an ineffective-assistance claim. He also makes a blanket claim that counsel rendered deficient performance with respect to "arguments addressed elsewhere in [his] brief."

{¶ 81} To establish his claim, Wesson bears the burden to demonstrate that counsel's performance "fell below an objective standard of reasonableness" as determined by "prevailing professional norms" and to demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 688, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). When performing this analysis, courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.

{¶ 82} Three of Wesson's ineffective assistance claims may be denied for the same reasons that we rejected the errors asserted in propositions I, VI, and

VII.[2] Counsel did not perform deficiently (1) by "fail[ing] to object to the improper indictment which did not include the *mens rea* for Aggravated Robbery," because the indictment was not defective, (2) by failing to request merger of the aggravated robbery and tampering counts, because they were based on different conduct, or (3) by failing to object to victim-impact statements, because Wesson suffered no prejudice and there is no indication that the court relied on these statements in imposing sentence.

{¶ 83} Wesson also asserts ineffective assistance because counsel failed to object to Judge Teodosio's appointment of the three-judge panel. We have clarified that as the judge presiding over the trial, Judge Teodosio should not have appointed the other members of the panel. Nonetheless, Wesson fails to demonstrate any reasonable probability that, but for counsel's failure to object, the result of the proceeding would have been different. *Strickland* at 694. Nothing in the record or Wesson's brief indicates that different judges would have been appointed or that had different judges been appointed, the outcome of the trial would have been different.

{¶ 84} Wesson's claim that counsel provided ineffective assistance by not contesting the state's proof that he committed the murder while under detention is mooted by our resolution of proposition of law II.

{¶ 85} For the foregoing reasons, we reject this proposition of law.

### *Cumulative Error*

{¶ 86} In proposition of law IX, Wesson raises cumulative error. According to Wesson, the trial court deprived him of a fair trial due to a combination of errors that violated the Fifth, Sixth, Eighth, and Fourteenth Amendments.

---

2. Wesson's blanket claim of deficient performance based on "arguments addressed elsewhere in [his] brief" can be rejected for similar reasons.

{¶ 87} The cumulative error doctrine provides that "a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of a fair trial even though each of the numerous instances of trial-court error does not individually constitute cause for reversal." *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, ¶ 223, citing *State v. DeMarco*, 31 Ohio St.3d 191, 509 N.E.2d 1256 (1987), paragraph two of the syllabus.

{¶ 88} Here, Wesson cannot point to "multiple instances of harmless error." *State v. Garner*, 74 Ohio St.3d 49, 64, 656 N.E.2d 623 (1995). Nor does Wesson explain how the alleged errors collectively deprived him of a fair trial, and as we explained in *State v. Bethel,* 110 Ohio St.3d 416, 2006-Ohio-4853, 854 N.E.2d 150, "it is not enough simply to intone the phrase 'cumulative error.' " *Id.* at ¶ 197.

{¶ 89} Accordingly, this proposition of law is overruled.

### Settled Issues

{¶ 90} In propositions X, XI, and XII, Wesson presents 12 constitutional challenges to Ohio's capital punishment scheme. We summarily reject these claims, as we have done in prior decisions. *See, e.g., Fry*, 125 Ohio St.3d 163, 2010-Ohio-1017, 926 N.E.2d 1239, at ¶ 215-216; *State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31, ¶ 381-383; *State v. Carter*, 89 Ohio St.3d 593, 607-608, 734 N.E.2d 345 (2000). As we explained in *State v. Jenkins*, 15 Ohio St.3d 164, 473 N.E.2d 264 (1984), paragraph one of the syllabus, "Ohio's statutory framework for imposition of capital punishment, as adopted by the General Assembly effective October 19, 1981, and in the context of the arguments raised herein, does not violate the Eighth and Fourteenth Amendments to the United States Constitution or any provision of the Ohio Constitution."

{¶ 91} Wesson also argues that Ohio's death penalty statutes violate international law and treaties and therefore offend the Supremacy Clause of the U.S. Constitution. However, we have "rejected the argument that Ohio's death

penalty statutes are in violation of treaties to which the United States is a signatory, and thus offend[ ] the Supremacy Clause of the United States Constitution." *State v. Bey*, 85 Ohio St.3d 487, 502, 709 N.E.2d 484 (1999).

{¶ 92} These propositions of law are overruled.

## INDEPENDENT SENTENCING EVALUATION

{¶ 93} Because we affirm Wesson's conviction for aggravated felony murder, R.C. 2903.01(B), we are required to independently review the sentence of death imposed by the trial court. R.C. 2929.05(A). In doing so, we must determine whether the evidence supports the trial court's finding of aggravating circumstances, whether the aggravating circumstances outweigh the mitigating factors, and whether Wesson's death sentence is proportionate to those affirmed in similar cases. *Id*.

### *Aggravating Circumstances*

{¶ 94} The court convicted Wesson of specifications alleging that he (1) murdered Emil Varhola as "part of a course of conduct involving the purposeful killing of or attempt to kill two or more persons by the offender," R.C. 2929.04(A)(5), and (2) was "the principal offender in the commission of the aggravated murder" and committed that murder while "committing, attempting to commit, or fleeing immediately after committing or attempting to commit * * * aggravated robbery," R.C. 2929.04(A)(7). The evidence at trial supports the finding of both aggravating circumstances.

{¶ 95} First, the evidence establishes that Wesson's murder of Emil and attempted murder of Mary were purposeful and part of a single course of conduct. *See* R.C. 2929.04(A)(5). Wesson used the same knife to stab both victims, and the attacks were linked in time and place. *See State v. Sapp*, 105 Ohio St.3d 104, 2004-Ohio-7008, 822 N.E.2d 1239, ¶ 52 (factors such as time, location, and murder weapon can establish the factual link proving a course of conduct). The evidence also supports the conclusion that Wesson acted purposefully. He

stabbed Emil eight times, inflicting two fatal wounds, and when Mary discovered Wesson standing over her husband's body, he stabbed her several times in the chest and upper abdomen. According to Mary's testimony, Wesson stopped attacking her only when she pretended to be dead. The evidence supports the trial court finding that Wesson is guilty of the specification set forth in R.C. 2929.04(A)(5).

{¶ 96} Second, the evidence also proves that Wesson committed the crime as the principal offender and murdered Emil in the course of committing aggravated robbery. *See* R.C. 2929.04(A)(7). Wesson acted alone and took a gun, a cup, Emil's wallet, and Mary's jewelry from the home when he left. This evidence supports the trial court finding that Wesson is guilty of the specification set forth in R.C. 2929.04(A)(7).

{¶ 97} The trial court also found Wesson guilty of a third specification, committing the offense while under detention as a result of a prior conviction pursuant to R.C. 2929.04(A)(4)(b). We reverse that finding of guilt based on the improper imposition of postrelease control in 2003. We further conclude that the trial court erred by considering that specification as an aggravating circumstance. However, we cure that error by excluding that specification from our independent review of Wesson's sentence. *State v. Davis*, 76 Ohio St.3d 107, 115, 666 N.E.2d 1099 (1996) (affirming death sentence after reversing a conviction for an attempted-rape specification and "independently reweigh[ing] the remaining aggravating circumstances against the mitigating factors"); *see Clemons v. Mississippi*, 494 U.S. 738, 745, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990); *Stringer v. Black*, 503 U.S. 222, 230-231, 112 S.Ct. 1130, 117 L.Ed.2d 367 (1992). In accord with the foregoing authority, we exclude this third specification—that Wesson committed the offense while under detention as a result of a prior conviction—from our independent sentencing evaluation.

*Mitigating Evidence*

{¶ 98} We are further required to determine whether the aggravating circumstances of which Wesson has been convicted—excluding the commission of the offense while under detention—outweigh the mitigating factors in this case beyond a reasonable doubt. In doing so, we consider whether there is anything mitigating about the "nature and circumstances of the offense, [or] the history, character, and background of the offender." R.C. 2929.04(B). In addition, we consider the specific mitigating factors set forth in R.C. 2929.04(B): (B)(1) (victim inducement), (B)(2) (duress, coercion, or strong provocation), (B)(3) (mental disease or defect), (B)(4) (youth of the offender), (B)(5) (lack of a significant criminal record), (B)(6) (accomplice only), and (B)(7) (any other relevant factors).

{¶ 99} During the penalty phase of the trial, defense counsel argued that two of the statutory mitigating factors are present in this case. One, a claim that Wesson has a mental condition affecting his ability to conform his conduct to the requirements of the law. *See* R.C. 2929.04(B)(3). Two, a variety of other factors relevant to whether Wesson should receive a death sentence pursuant to the catchall mitigation provision contained in R.C. 2929.04(B)(7). In support, Wesson presented two mitigation witnesses and made an unsworn statement in open court.

{¶ 100} Wesson's older sister, Yvette Wesson, testified about Wesson's family background and his formative years. She testified that he has two full siblings, several half-siblings, children, and many grandchildren, and that he has the support of his family.

{¶ 101} His mother, Barbara Wesson, worked multiple jobs and often relied on family, friends, and neighbors to help out during Wesson's youth. The family moved frequently, living in various homes in the Cleveland and Detroit areas. The Wessons' house burned down when Wesson was five years old, and

the family moved in with Wesson's paternal grandmother. The children were later separated and lived with different family members for a while before their mother was able to care for them again. The Children's Services Board periodically monitored the family throughout Wesson's youth.

{¶ 102} Yvette considered herself his primary caregiver for the first five or six years of his life. She recalled an incident when her mother and grandmother wanted to go out but lacked a babysitter, so they locked the children in the closet with a baby bottle filled with milk and gin (for Wesson, then an infant) and a bottle of beer (for Yvette, then two and one-half years old). When Wesson drank the bottle, he passed out and Yvette thought he had died.

{¶ 103} Wesson's parents were both alcoholics, and Barbara drank alcohol during her pregnancies. His father, Hersie Wesson Sr., turned violent when drunk, regularly beating the children with instruments like razor straps, bed slats, electric cords, belts, and switches. His father gave him a particularly hard time, telling Wesson that he did not have his father's blood—Wesson had received a blood transfusion at birth—and regularly belittling and beating him for stuttering.

{¶ 104} His father moved out of the family home when Wesson was five or six years old, and his mother hired a babysitter to care for the children while she worked. She also began dating a violent man named Marino. The babysitter mistreated Wesson, and Marino regularly beat Barbara in front of him—one time severely enough to cause a miscarriage. Another time, the children watched Marino tie their mother up, put her in the bathtub, and beat her.

{¶ 105} During his preteen years, Wesson lived with his maternal grandmother, Evelyn Williams, in Akron, Ohio. Williams, a functional alcoholic, regularly beat him with her cane, but her brother, Eugene, intervened to protect him from abuse. Yvette described Eugene as the children's "savior."

{¶ 106} Yvette also testified that Wesson suffered several head injuries. As an infant, he fell down the stairs and "cracked his head open," but he received

no treatment. As a teenager, he suffered injuries to the back of his head when he was beaten during a robbery. And later in life, Wesson's younger brother smashed a 30 to 40 pound lead-glass basket over his head.

{¶ 107} Yvette noted that until February 2008, Wesson had complied with his parole and worked with her in a bakery.

{¶ 108} Dr. Jeffrey Smalldon, a clinical and forensic psychologist, evaluated Wesson. He discussed Wesson's family background and his "chaotic" childhood, noting that Wesson moved frequently—often between relatives' homes—and received minimal supervision as a child. Children mocked Wesson at school, especially for his lifelong stuttering problem, and he quit school after seventh grade, spending a lot of his adolescence in the juvenile system.

{¶ 109} Smalldon testified that Wesson told him he "had a bad childhood" but Smalldon noted that Wesson did not dwell on his parents' alcoholism or his own physical abuse. Wesson's father physically abused him and ridiculed him for stuttering, and he once pointed a gun at Wesson. And Wesson regularly witnessed acts of violence as a child, which included observing the shooting death of his father's girlfriend. Smalldon opined that these experiences led Wesson to see physical violence as an acceptable way to resolve conflicts and contributed to his sense of vulnerability.

{¶ 110} Smalldon also noted that Wesson had suffered serious head injuries. As a teenager, police officers hit the back of Wesson's head with the butt of a gun. Years later, Wesson's brother hit him over the head with a glass object, and though he lost consciousness, he received no medical treatment. Wesson also reported falling from a tree as an adult and striking his head. Smalldon testified that even relatively mild head injuries can be associated with impulsivity and poor judgment, but he could not corroborate the injuries Wesson reported with either hospital records or results from independent neuropsychological testing.

{¶ 111} In addition, Smalldon administered a range of tests during his evaluation of Wesson, who cooperated with most tests and appeared motivated to do well and anxious to be deemed mentally fit and motivated. On the Wide-Range Achievement Test, Wesson functioned at a third-grade level for word recognition, a sixth-grade level in spelling, and a second-grade level in arithmetic. Wesson's performance on a standardized IQ test yielded an estimated full-scale IQ of 76. On the Trail Making Test, Wesson scored in the normal range for visual scanning and speed, but badly faltered on the part of the test that required mental flexibility, which might indicate brain impairment. He demonstrated deficits on the Aphasia Screening Test, which might also indicate impaired brain functioning. However, Wesson performed well on the Rey's 15-item Visual Memory Test, a screening mechanism for assessing the subject's motivation to give his best effort, and did reasonably well on the Bender Visual Motor Gestalt Test, a test designed to assess brain impairment.

{¶ 112} Wesson completed two self-report symptom checklists, both of which indicated clinically significant symptoms of depression, anxiety, and feelings of inadequacy and low self-worth. Wesson had also been diagnosed with major depression in 2007, when he lost his job and his criminal background impeded his finding new work.

{¶ 113} According to Smalldon, Wesson fathered five children by three different women. His adult relationships with women were fraught with conflict and alcohol issues. He stated that Wesson seemed to have become frantic whenever he thought he was going to be rejected and abandoned by a woman, largely due to feelings of inadequacy and self-doubt.

{¶ 114} Wesson began drinking at an early age, abused alcohol regularly as an adult, engaged in episodes of binge drinking, and was diagnosed with alcohol dependence in 2008. Smalldon opined that prenatal alcohol exposure may have caused Wesson to suffer deficits such as an inability to assess the

consequences of his behavior, an inability to respond appropriately to subtle social cues, and weak language skills.

{¶ 115} Smalldon diagnosed Wesson with (1) depressive disorder (not otherwise specified), (2) borderline intellectual functioning, (3) alcohol dependence, and (4) a personality disorder with passive-aggressive, narcissistic, and antisocial features. According to Smalldon, these aspects of Wesson's personality make him impulsive and likely to overreact to perceived slights.

{¶ 116} Smalldon opined that Wesson's limited intellectual ability, struggles at school, difficulty with stuttering, and lack of support at home may have rendered him unable to successfully adapt to the circumstances of his childhood and adolescence. He also indicated that Wesson's limited intellectual ability, personality, history of depression, and alcohol exposure may have compromised his ability to conform his conduct to the requirements of the law. Nonetheless, Smalldon testified that he believed that Wesson had understood the criminality of his behavior. And on cross-examination, he acknowledged that most people with issues similar to Wesson's do not commit crimes and that Wesson had received mental health treatment while in the juvenile justice system and while on parole as an adult.

{¶ 117} In an unsworn statement, Wesson expressed his fondness for the Varholas. He had visited with Emil Varhola approximately 12 times in the yard outside the Varhola home and had been in the home once before. He stated that on that occasion, Emil came to the door holding a handgun, but he put it in his pocket when he recognized Wesson.

{¶ 118} Wesson said he did not intend to rob or hurt the Varholas when he went to their house on February 25, 2008. Rather, he knocked on the their door around 6:40 p.m., to ask if he could wait there for his girlfriend's bus to arrive at 7:43 p.m. He claimed the Varholas let him in and offered him food, coffee, and

beer. Emil showed Wesson his guns, taking a long gun out of the living-room gun cabinet and handing it to Wesson.

{¶ 119} Wesson said that he went upstairs to use the restroom, and when he returned, he saw Mary watching television in the living room and Emil in the kitchen. According to Wesson, Emil then made a comment about his wife's chest, and when Wesson said he did not like the comment, Emil stood up, grabbed a knife, and walked toward him. Wesson claimed that he took the knife from Emil and stepped back, but when he saw Emil reach into his pocket, he thought Emil might be reaching for the handgun Emil sometimes carried. Wesson then "reacted to that threat" and stabbed him.

{¶ 120} After Emil fell to the ground, Wesson felt Emil's pockets and realized he did not have a gun. He then panicked, asking Mary, "Where is the gun?" When Mary hit Wesson with her cane, he "turned on her," but he stopped the attack when Mary begged him not to kill her.

{¶ 121} Wesson spoke about his having respect for his elders and admitted that "maybe [he] reacted too quickly." He also expressed sorrow for his actions, saying that he believed the Varholas were nice people, but he then immediately stated, "Once I feel my life is threatened, I'm going to react," explaining that after the childhood he had had, he "will never let anyone ever hurt [him] again." And ultimately, Wesson failed to accept responsibility for his crimes, blaming Emil by claiming that he would not be on trial and Emil "wouldn't be up in heaven with God right now" if Emil had not reached into his pocket.

{¶ 122} Wesson insisted that he did not need to rob or kill anyone for money or a gun. According to Wesson, he was not pressed for money and he could easily have secured a gun from friends on the east side. Wesson admitted that he took the gun and cup from the house because he knew the gun had his fingerprints on it.

{¶ 123} Wesson acknowledged the love and support of his family members, and he concluded his statement by telling the panel that he does not use crack, dresses nicely, is polite, and is sorry.

### *Weighing*

{¶ 124} We now assign weight to Wesson's mitigating evidence and determine whether the aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt.

{¶ 125} As an initial matter, we find nothing mitigating in the nature and circumstances of the offense. R.C. 2929.04(B). Wesson murdered an 81-year-old man and attempted to murder his 77-year-old wife in their own home. The victims had befriended Wesson and extended him hospitality, even on the day of the murder. No evidence supports Wesson's unsworn claim that Emil threatened him with a knife or a gun. At most, Wesson knew that Emil owned guns, including a handgun, but far from posing a legitimate threat to Wesson, these victims had serious medical problems and limited mobility, and he responded to a perceived threat by stabbing the Varholas repeatedly with a knife.

{¶ 126} We find that five of the statutorily enumerated mitigating factors do not apply. We give no weight to Wesson's unsworn and unbelievable claims that Emil and Mary induced, facilitated, or provoked the crime. *See* R.C. 2929.04(B)(1) and (B)(2). An offender's youth is a mitigating factor pursuant to R.C. 2929.04(B)(4), but Wesson was 50 years old at the time of the crime. And Wesson cannot point to a lack of significant criminal history, *see* R.C. 2929.04(B)(5), or other offenders who participated in the crime, *see* R.C. 2929.04(B)(6).

{¶ 127} We give limited weight to evidence Wesson presented to show that a mental disease or defect affected his ability to conform his conduct to the requirements of the law. *See* R.C. 2929.04(B)(3). Dr. Smalldon testified that Wesson's ability to conform his conduct to the law may have been compromised

SUPREME COURT OF OHIO

at the time of the murder based on (1) his limited intellectual ability, (2) his personality disorder with passive aggressive, narcissistic, and antisocial features, (3) his history of depression, and (4) his history with alcohol. But neither long-term depression nor Wesson's personality disorders meets the requirements for a "mental disease or defect" under R.C. 2929.04(B)(3). *See Bey*, 85 Ohio St.3d at 507-508, 709 N.E.2d 484 (finding no mental disease or defect where defendant suffered from long-term depression and a serious personality disorder with antisocial and paranoid features); *State v. Fox*, 69 Ohio St.3d 183, 192, 631 N.E.2d 124 (1994) (finding no mental disease or defect after defendant established a personality disorder). Accordingly, Smalldon's opinion deserves only limited weight under R.C. 2929.04(B)(3).

{¶ 128} This evidence is also relevant to the catchall mitigation provision contained in R.C. 2929.04(B)(7), and when it is viewed alongside other mitigating evidence presented by Wesson, we find that he has presented mitigating evidence that is entitled to significant weight pursuant to R.C. 2929.04(B)(7).

{¶ 129} Wesson presented evidence of a long history of contact with alcohol. Prenatal alcohol exposure may have affected his ability to assess the consequences of his behavior, his ability to respond appropriately to social cues, and his language skills. In addition, Wesson consumed alcohol at a young age, was alcohol dependent, and engaged in bouts of binge drinking. However, Wesson did not present evidence of alcohol impairment at the time of the murder, though he claimed that he had been impaired the next day, when he spoke to police.

{¶ 130} Wesson has limited intellectual ability and may have suffered brain impairment caused by head injuries. He has a low IQ and tested at elementary school level in arithmetic, word recognition, and spelling. Smalldon testified that Wesson's low performance on certain tests could indicate brain impairment, although he could not confirm it.

{¶ 131} Further, according to Smalldon, Wesson struggles with depression, has significant feelings of inadequacy and low self-worth, and is prone to overreacting, caused in part by his unstable childhood. As a young child, his older sister regularly cared for him, and he was shuttled between various relatives. His alcoholic father physically abused him, and Wesson witnessed serious violence in the home. Wesson also had a severe stutter, and his own father and peers mocked him.

{¶ 132} This evidence is tempered, however, by testimony that relatives and friends helped the family during his childhood. In fact, he still enjoys the love and support of numerous family members, and some of them were present in the courtroom at sentencing.

{¶ 133} Considering all of this evidence, we conclude that Wesson's background, history with alcohol, and mental difficulties are mitigating pursuant to R.C. 2929.04(B)(7) and entitled to significant weight.

{¶ 134} Nonetheless, the weight of Wesson's mitigation evidence is substantially outweighed by the weight of the aggravating circumstances in this case. After full consideration of the aggravating circumstances and the mitigating factors, we conclude that the aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt.

### Proportionality

{¶ 135} Finally, we conclude that the death penalty is appropriate and proportionate compared to death sentences affirmed in other robbery-murder cases. *See Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31 (elderly victim murdered in home robbery); *State v. Foust*, 105 Ohio St.3d 137, 2004-Ohio-7006, 823 N.E.2d 836 (one murder and one attempted murder in home robbery); *State v. Dennis*, 79 Ohio St.3d 421, 683 N.E.2d 1096 (1997) (one murder and one attempted murder in separate armed robberies). It is also proportionate to death sentences upheld for other course-of-conduct murders.

*State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038 (one murder and two attempted murders); *Foust*, 105 Ohio St.3d 137, 2004-Ohio-7006, 823 N.E.2d 836 (one murder and one attempted murder).

## Conclusion

{¶ 136} Accordingly, we reverse Wesson's conviction for aggravated murder in Count Three, the specifications related to that count, and the specification to Count Two alleging that he committed the murder while under detention. However, we affirm the remaining convictions, the imposition of capital punishment on Count Two, and the imposition of consecutive terms of imprisonment on the noncapital offense convictions.

Judgment accordingly.

PFEIFER, ACTING C.J., and VUKOVICH and KENNEDY, JJ., concur.

FRENCH, J., concurs in part and dissents in part.

LANZINGER, J., dissents.

O'NEILL, J., dissents without opinion.

JOSEPH J. VUKOVICH, J., of the Seventh Appellate District, sitting for O'CONNOR, C.J.

———————————

**FRENCH, J., concurring in part and dissenting in part.**

{¶ 137} I join the majority in all but the part of its decision vacating Wesson's conviction and specifications for aggravated murder while under detention. On this point, I agree with Justice Lanzinger; Wesson's 2003 sentence was not void, and he committed the murder while under postrelease control. In all other respects, I concur.

———————————

**LANZINGER, J., dissenting.**

{¶ 138} I respectfully dissent. For the reasons expressed in my opinion concurring in part and dissenting in part in *State v. Billiter*, 134 Ohio St.3d 103,

2012-Ohio-5144, 980 N.E.2d 960, I would not find void any portion of Wesson's 2003 sentence. As the mistake was solely in the court's exercise of jurisdiction in imposing postrelease control (imposing three years of discretionary, rather than three years of mandatory, postrelease control), the sentence was merely voidable. Since the error was not raised on appeal within 30 days, res judicata applies and Wesson remained under the supervision of the Adult Parole Authority.

{¶ 139} I also dissent from the majority's judgment affirming the remaining capital convictions. I would vacate the convictions and remand the case to the trial court for the proper selection of a three-judge panel in this case as precedent demands. Although it acknowledges the requirement of strict compliance with R.C. 2945.05 and 2945.06 when a defendant waives a jury in a capital case, the majority nonetheless declares that Wesson forfeited the right to challenge the way that the three-judge panel was selected because he assented to the procedure followed by Judge Teodosio in appointing the members of the panel. This holding is inconsistent with our decisions in *State v. Parker*, 95 Ohio St.3d 524, 2002-Ohio-2833, 769 N.E.2d 846; *State v. Filiaggi*, 86 Ohio St.3d 230, 239, 714 N.E.2d 867 (1999); *State v. Pless*, 74 Ohio St.3d 333, 658 N.E.2d 766 (1996); and *Pratts v. Hurley*, 102 Ohio St.3d 81, 2004-Ohio-1980, 806 N.E.2d 992.

{¶ 140} In *Parker*, the defendant in a capital case waived his right to a trial by jury, waived his right to a three-judge panel, and pled guilty to aggravated murder. *Id.* at ¶ 2. We affirmed the court of appeals' decision to vacate the conviction, holding that the defendant could not waive the right to a three-judge panel. *Id.* at ¶ 11. In *Filiaggi*, the defendant had waived his right to a trial by jury. *Id.* at 238. The three-judge panel entered convictions only on the aggravated-murder charge and specifications, and the presiding judge decided the noncapital charges. *Id.* at 239. We reversed the judgment and remanded the case for the three-judge panel to render verdicts on the noncapital charges, holding that

because we have consistently required strict compliance with R.C. 2945.06, "the presiding judge did not have sole authority to enter a verdict on the noncapital charges." *Id.* at 240. Here, Wesson executed a jury waiver, consenting to be tried by a panel "consisting of Judge Thomas A. Teodosio, presiding at this time, and two other judges to be designated *pursuant to law.*" (Emphasis added.) Wesson thus did not waive his rights under R.C. 2945.06 to the following of the proper procedure in selecting his three-judge panel. *Parker* and *Filiaggi* would not allow him to do so in any event.

{¶ 141} Furthermore, the majority's opinion in this case is yet another example of the inconsistent holdings of this court in cases in which the trial-court judge acted contrary to a statutory mandate. The majority reverses Wesson's conviction for aggravated murder while under detention and for the corresponding specification on Count Two due to a postrelease-control error. So on the one hand, the majority collaterally declares a portion of Wesson's 2003 sentence void because the trial judge imposed three years of discretionary rather than mandatory postrelease control. Then on the other hand, although the trial judge did not have authority to appoint the other two judges of the three-judge panel in this capital case, the majority affirms Wesson's remaining capital convictions. Apparently, a postrelease-control error is more important than a procedural error in a capital case. I cannot agree with this inconsistency. I would hold that any error in the court's exercise of jurisdiction is voidable rather than void.

{¶ 142} As we held in *Pratts*,

> [t]he failure of a court to convene a three-judge panel, *as required by R.C. 2945.06*, does not constitute a lack of subject-matter jurisdiction that renders the trial court's judgment void ab initio and subject to collateral attack in habeas corpus. It

> *constitutes an error in the court's exercise of jurisdiction* that must
> be raised on direct appeal.

(Emphases added.) 102 Ohio St.3d 81, 2004-Ohio-1980, 806 N.E.2d 992, at syllabus.

{¶ 143} Wesson raised this error on direct appeal. I would therefore vacate the convictions and remand the case for a new trial in accordance with the mandatory capital procedures within R.C. 2945.06. Because I would not hold any portion of the 2003 sentence to be void, Wesson would still be eligible to be convicted of Count Three and the specification to Count Two for aggravated murder while under detention.

————————————————

Sherri Bevan Walsh, Summit County Prosecuting Attorney, and Richard S. Kasay, Assistant Prosecuting Attorney, for appellee.

David L. Doughten and George C. Pappas, for appellant.

————————————————