[Cite as *State v. Bridle*, 2023-Ohio-109.]

STATE OF OHIO      )          IN THE COURT OF APPEALS
                     )ss:        NINTH JUDICIAL DISTRICT
COUNTY OF MEDINA      )

STATE OF OHIO                   C.A. No.       21CA0061-M

     Appellee

     v.                                  APPEAL FROM JUDGMENT
                                        ENTERED IN THE
DANIEL J. BRIDLE            COURT OF COMMON PLEAS
                                        COUNTY OF MEDINA, OHIO
     Appellant           CASE No.      20CR0878

DECISION AND JOURNAL ENTRY

Dated: January 17, 2023

---

CARR, Judge.

{¶1} Appellant, Daniel J. Bridle, appeals the judgment of the Medina County Court of Common Pleas. This Court reverses and remands.

I.

{¶2} This case arises out of an incident that occurred at a house in Hinkley, Ohio, during the early morning hours of December 5, 2020. Bridle travelled to the home of B.P. and approached the front door with a shotgun. When B.P. refused to open the front door, Bridle fired the shotgun through the door. Although B.P. was able to escape, Bridle entered the home and caused extensive damage to B.P.'s property. The Medina County Grand Jury indicted Bridle on one count of attempted aggravated murder, one count of attempted murder, one count of felonious assault, one count of aggravated burglary, and one count of vandalism. All of the counts contained firearm specifications and the vandalism count also contained a forfeiture specification. Bridle pleaded not guilty to the charges at arraignment.

**{¶3}** After events that transpired while Bridle was in jail, the grand jury returned a supplemental indictment charging Bridle with two counts of intimidating a victim in a criminal case and two counts of pandering obscenity involving a minor. Bridle pleaded not guilty to these charges as well.

**{¶4}** The matter ultimately proceeded to a jury trial where Bridle was convicted of the charges against him. After finding that a number of the offenses merged, the trial court imposed a prison sentence of a minimum of 24 years and a maximum of 29 years and ordered Bridle to pay restitution. Bridle was also classified as a Tier II Sexual Offender.

**{¶5}** On appeal, Bridle raises six assignments of error. This Court rearranges those assignments of error to facilitate review.

II.

### ASSIGNMENT OF ERROR I

THE TRIAL COURT PREJUDICIALLY DENIED BRIDLE'S CONSTITUTIONAL RIGHTS TO PRESENT A DEFENSE, TO A JURY'S DETERMINATION OF HIS CASE, TO EFFECTIVE COUNSEL, AND TO DUE PROCESS AND A FAIR TRIAL WHEN, AFTER THE STATE HAD RESTED AND AFTER BRIDLE HAD ALREADY BEGUN TESTIFYING, THE COURT REVERSED ITS RULING ON THE ADMISSION OF EVIDENCE CRITICAL TO BRIDLE'S ANNOUNCED DEFENSE, IN VIOLATION OF THE 5TH, 6TH AND 14TH AMENDMENTS TO THE U.S. CONSTITUTION, ART. I, [SECTIONS] 5, 10, AND 16 OF THE OHIO CONSTITUTION, AND OHIO'S RULES OF EVIDENCE.

**{¶6}** In his first assignment of error, Bridle maintains that the trial court violated an array of his constitutional rights when, in the middle of the defense case-in-chief, the trial court reversed its position on the admissibility of several pieces of provocation and state-of-mind evidence after it had previously made pretrial and mid-trial rulings that the evidence would be admissible. Bridle argues that his constitutional right to present a defense was undermined because both parties had relied on the trial court's prior rulings throughout the course of trial. This Court agrees.

Background

**{¶7}** In 2015, Bridle was diagnosed with cancer and he began a series of holistic cancer treatments, including cryotherapy and Reiki healing. Bridle's marital relationship began to falter around that time and he entered into an extramarital relationship with D.K., who was supportive of the holistic treatments. D.K. served as a care provider for Bridle in addition to her romantic involvement. D.K. and several of her children moved into Bridle's Hudson residence in 2019. Bridle became close to D.K.'s children, including D.K.'s thirteen-year-old daughter, L.W. In November 2019, however, D.K. began a relationship with another man, B.P. The relationship between D.K. and B.P. grew more serious over the course of 2020. L.W. accompanied D.K. and B.P. on two trips to South Carolina. B.P. assisted D.K. and her children in moving out of Bridle's home in September 2020, although D.K. continued to serve as a care provider for Bridle.

**{¶8}** The State's evidence demonstrated that in the early morning hours of December 5, 2020, Bridle armed himself with a shotgun and drove to B.P.'s home in Hinkley, Ohio. When B.P. refused to open the front door, Bridle fired a gunshot through the door. Bridle then entered the home and fired additional shots and caused over $100,000 in damage to B.P.'s property. B.P. fled the house in a panic and called 911. Police arrived on the seen thereafter and arrested Bridle.

**{¶9}** Bridle's intended defense to the charges against him was predicated on presenting evidence about a series of events that allegedly occurred in the lead-up to the incident that caused him to believe that L.W. was being sexually abused by B.P.

**{¶10}** Prior to trial, the State filed a motion in limine under seal wherein it asked the trial court to bar the admission of any evidence regarding allegations of sexual misconduct against B.P. The State asserted that the allegations against B.P. were unfounded and that the highly prejudicial

nature of evidence in support of the accusations would outweigh the probative value. The State further argued that the allegations were not relevant to any element of proof or point of mitigation.

{¶11} The trial court permitted the parties to make oral arguments on the motion prior to voir dire. The exchange largely focused on two pieces of evidence. The first was a set of letters that Bridle allegedly received several weeks before the incident where the anonymous author made sexualized comments about L.W.[1] The second was an alleged excited utterance by L.W. where she admitted to Bridle that she had been sexually abused by B.P.[2] After allowing the parties to present arguments on an array of issues, the trial court stated, "I'm letting it all in. I'm denying [the] motion in limine. I am letting everybody get everything in and letting the jury sort it out."

{¶12} During opening statements, defense counsel referenced the contents of the letters and noted Bridle's belief that it was B.P. who sent the letters. Defense counsel explained that Bridle had given the letters to the Stow police. When defense counsel began to discuss the circumstances surrounding the excited utterance, the State objected on the basis that L.W. was not on the witness list. The trial court overruled the objection and defense counsel informed the jury that Bridle intended to introduce evidence that L.W. told Bridle that she was sexually abused by B.P. Defense counsel continued that, on the evening of December 4, 2020, D.K. travelled to Bridle's house in order to perform Reiki treatment. When Bridle raised the subject of the letters, D.K. and Bridle engaged in a heated argument and D.K. left prior to completing the treatment. Defense counsel suggested the evidence would show that, later that evening, Bridle traveled to

---

[1] In addition to debating whether it would be possible to lay a proper foundation for the letters, the parties sharply disputed whether the letters were relevant given that they referenced prospective conduct as opposed to conduct that had already occurred.

[2] Defense counsel indicated that Bridle intended to testify as to the excited utterance. The trial court expressed concern about the ramifications if Bridle ultimately decided to exercise his right not to testify in his own defense. Defense counsel responded that he anticipated that Bridle would take the witness stand.

B.P.'s home in order to confront him about the letters. Defense counsel stated that while Bridle intended to merely confront B.P., Bridle was thrust into a state of rage by a comment that B.P. made when Bridle was standing at the front door. Near the end of his opening statement, defense counsel indicated that after the incident occurred and Bridle had been taken into custody, Bridle told the officers that B.P. had ruined his life by destroying his family and molesting L.W.

{¶13} Prior to calling B.P. as its first witness, the State asked the trial court to reconsider its prior evidentiary ruling on the basis that the events mentioned in defense counsel's opening statement occurred two weeks prior to the incident and, therefore, due to the passage of time, could not be used to show sufficient provocation as a matter of law. The trial court noted that it had the same concern. The trial court then indicated that unless defense counsel agreed to refrain from asking B.P. about the alleged sexual abuse on cross-examination, the trial court would simply grant the motion in limine. Defense counsel reluctantly agreed. The State indicated that such a resolution was sufficient at that junction of the proceedings but the matter would need to be revisited given that Bridle intended to testify to those events.

{¶14} Thereafter, the State asked for a recess in the middle of its direct examination of B.P. At that time, the trial court indicated that it wanted to resolve the motion in limine. The trial court inquired of defense counsel as to whether there were temporal concerns with introducing evidence about the reception of the letters and L.W.'s statements to Bridle given that those events allegedly occurred almost two weeks prior to the December 5, 2020 incident. Defense counsel explained those events ultimately led to an argument between Bridle and D.K. on the evening of December 4, 2020, meaning there was a triggering event just hours before the alleged incident. At that point, the trial court indicated that it would allow the evidence to be admitted. In response,

the State argued that the trial court was effectively reversing itself. The trial court then made the following statement:

> [T]echnically this is why I don't like to rule on motions in limine until I hear how the information is coming in because under the Rules [of Evidence], a motion in limine is no longer interlocutory. It is a final decision that people can proceed on. So technically if anybody was going to argue that I should not have changed my mind, it would have been the Defense but the Defense has given me sufficient information that I'm going back to the decision I made yesterday on the original motion in limine and letting everything in.

{¶15} In light of this ruling, the State continued its direct examination of B.P. and asked several questions about his relationship with L.W. B.P. testified that he took two trips to Myrtle Beach with D.K. and L.W. L.W. had her own room on those trips and B.P. was never alone with her. B.P. firmly denied that he sexually abused L.W. When asked if he had ever been accused of inappropriate conduct, B.P. testified that, upon returning from Myrtle Beach in July 2020, he learned from D.K. that there was a mysterious letter that suggested that he had designs on carrying on an inappropriate relationship with L.W. Several months later, when B.P. and D.K. returned from a trip to Mexico just prior to Thanksgiving in 2020, B.P. was contacted by Stow police and asked about additional letters. B.P. testified that the conversation was short and direct and that he denied any knowledge about the subject matter of the letters or who might have authored them. B.P. explained that he never saw hard copies of the letters but he was shown photos of the letters at the police station the day after the December 5, 2020 incident.

{¶16} On cross-examination, Bridle introduced a written statement that B.P. gave to police following the December 5, 2020 incident. Therein, B.P. indicated that, on November 16, 2020, D.K. told him about a letter accusing him of being a pedophile. B.P. testified that he had a vague understanding of the letter's existence prior to that point but it was not until mid-November

that he learned about the severity of its contents.[3]  A detective showed B.P. photographs of the letters at the police station after the home invasion.  When defense counsel marked the letters as exhibits for identification purposes, the State requested a sidebar and raised an authentication objection.  The trial court allowed the letters to be introduced for the limited purpose of allowing B.P. to confirm what the detective had shown him.  When defense counsel indicated that he hoped to admit the letters at a later point, the trial court stated that defense counsel could attempt to do so but not during the cross-examination of B.P.

{¶17}  Thereafter, defense counsel continued the cross-examination of B.P. and engaged in a line of questioning about the details of the home invasion.  In regard to the moment when B.P. saw Bridle at his front door, defense counsel asked whether B.P said, "I'm going to F your daughter [L.W.]"  B.P. responded in the negative.  The trial court sustained multiple objections to questions posed by defense counsel as to whether B.P. had done anything to provoke Bridle.

{¶18}  Bridle testified in his own defense.  After explaining the history of his relationship with D.K. and her children, Bridle indicated that he received two letters in his mailbox on November 20, 2020, the day before D.K. and B.P. were scheduled to travel to Mexico.  The letters had not been mailed but were marked, "Dan, read these[.]"  Defense counsel marked the letters as exhibits and Bridle confirmed that they were the letters he had received.  When defense

---

[3] B.P. testified that it was during that mid-November conversation that D.K. expressed her view that L.W.'s father, M.W., was responsible for the letters.

counsel asked if the letters were signed, the State objected and the trial court ruled that it would not permit questioning about the contents of the letters. After D.K. left for Mexico, Bridle traveled to her house in order to install a fence. When asked if he had a conversation with L.W. that day, the State again objected and requested a sidebar. The State asked for an in-camera review of Bridle's testimony to determine whether L.W.'s statements constituted inadmissible hearsay and whether it was necessary to explore the contents of the letters. Over the objection of defense counsel, the trial court agreed to remove the jury from the courtroom so that it could review Bridle's testimony.

{¶19} During the ensuing in camera inspection, Bridle testified that he was extremely distraught about the letters because the author expressed an intention to carry on a sexual relationship with L.W., who was a minor.[4] Bridle believed that B.P. was the author of the letters based on the personal information contained therein as well as his belief that he saw B.P.'s vehicle in his neighborhood at the time he retrieved the letters from his mailbox. Bridle explained that he spoke with L.W. about the letters in order to determine if she had been sexually abused. According to Bridle, L.W. became very upset, started crying, and repeatedly expressed fear that her mother would learn about what had happened. Bridle testified that L.W. provided details about being sexually abused by B.P. on multiple occasions.

{¶20} After hearing the testimony, the trial court indicated that it would not allow the evidence because L.W.'s statements did not fit within a hearsay exception and the general line of questioning was more prejudicial than probative. Defense counsel objected on the basis that the

---

[4] Bridle testified that the author of the letters referred to wanting "a little taste of chocolate[,]" which Bridle interpreted as a reference to L.W., given the fact that she was biracial.

parties had relied on the trial court's prior ruling and that defense counsel had specifically referenced the evidence in his opening statement.

{¶21} During the testimony that followed, Bridle made several general references to the letters and his conversation with L.W. but he was not permitted to discuss the contents of the letters or the subject matter of the conversation. For example, Bridle testified that D.K. came to his house for a treatment session the night before the incident but she became angry and left when he mentioned the letters.[5] Bridle testified that he decided to drive to Hinkley to confront B.P. about the letters. With respect to the exchange that occurred at the front door of B.P.'s house, Bridle suggested that he became enraged by a comment made by B.P. but he did not testify as to the nature of the comment. Near the end of Bridle's direct examination, defense counsel asked a question about whether Bridle's comments to police after being taken into custody were indicative of his state of mind. The trial court sustained an objection when, in answering the question, Bridle started to suggest that he was distraught because he had failed to protect L.W.

Discussion

{¶22} Bridle's foremost contention on appeal is that the trial court violated his right to present a defense when it repeatedly reversed its position as to whether he could introduce the provocation and state-of-mind evidence. Bridle emphasizes that the entirety of his defense theory was predicated on the trial court's ruling that it would allow him to present evidence

---

[5] The State presented evidence during its case-in-chief that Bridle had a text message exchange with another Reiki healer after D.K. left his house. Bridle expressed a high level of anger and made several profane comments about D.K. In pleading for the Reiki healer to call him, Bridle stated that he was about to go to Hinkley to kill someone with a shotgun. When Bridle took the stand, he testified that these text messages amounted to a cry for help and that he did not intend to shoot B.P.

about the events that occurred leading up to the December 5, 2020 incident.  Notably, Bridle does not merely challenge the trial court's ruling on the motion in limine but instead argues that the manner in which the trial court handled the provocation and state-of-mind evidence over the course of the trial violated his constitutional rights.

**{¶23}**  The United States Supreme Court has recognized that "the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'"  *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006), quoting *Crane v. Kentucky*, 476 U.S. 683, 690 (1986).  "The right to offer the testimony of witnesses[] * * * is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies."  *Washington v. Texas*, 388 U.S. 14, 19 (1967); *State v. Pieronek*, 9th Dist. Wayne No. 18AP0031, 2019-Ohio-4305, ¶ 18.

**{¶24}**  While a defendant does have a constitutional right to present a defense, he does not have an unfettered right to present evidence that is "incompetent, privileged, or otherwise inadmissible under standard rules of evidence."  *Taylor v. Illinois*, 484 U.S. 400, 410 (1988).  "[S]tate and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials.  Such rules do not abridge an accused's right to present a defense so long as they are not arbitrary or disproportionate to the purposes they are designed to serve."  (Internal citations and quotations omitted).  *United States v. Scheffer*, 523 U.S. 303, 308 (1998); *State v. Wesson*, 137 Ohio St.3d 309, 2013-Ohio-4575, ¶ 59.  The exclusion of evidence will be considered unconstitutionally arbitrary or disproportionate only when it "infringe[s] upon a weighty interest of the accused."  *Scheffer*, 523 U.S. at 308.

**{¶25}**  In this case, we are compelled to conclude that the manner in which the trial court repeatedly changed its position in handling the evidence in question created a sense of confusion

throughout the trial and resulted in a violation of Bridle's right to present a defense. Prior to trial, the trial court heard arguments regarding the letters as well as L.W.'s statement to Bridle that she had been sexually abused by B.P. The trial court ruled that it was "letting it all in[]" and that it would allow the jury to "sort it out." Bridle relied on this ruling during opening statements when he painted a detailed picture of the evidence he intended to present regarding the sequence of events leading up to the December 5, 2020 incident. The trial court reaffirmed its position about the admissibility of the evidence during the State's case-in-chief. Inexplicably, however, the trial court pivoted away from its ruling at several crucial junctures of the trial. While the State was permitted to pursue a line of questioning that allowed B.P. to discuss his knowledge of the letters and directly refute the allegations of sexual abuse, the trial court did not permit Bridle to cross-examine B.P. on the contents of the letter or whether B.P. may have done anything to provoke Bridle. Even more significantly, after permitting the State to engage B.P. in a line of questioning that directly challenged Bridle's defense theory, the trial court prohibited Bridle from telling his side of the story regarding the letters and the conversation with L.W. Under these circumstances, this Court has no choice but to conclude that Bridle's constitutional right to present a defense was undermined.

{¶26} In reaching this conclusion, we remain mindful that a trial court has the authority to exclude evidence based upon valid evidentiary rules. *See Id.* In this particular case, however, the manner in which the trial court repeatedly reversed its position on whether the evidence was admissible undermined Bridle's constitutional right to present a defense.

{¶27} Bridle's first assignment of error is sustained.

## ASSIGNMENT OF ERROR III

THE TRIAL COURT ERRED IN DENYING BRIDLE'S MOTION FOR ACQUITTAL ON THE PANDERING OBSCENITY CHARGES IN COUNTS 6 AND 7 BECAUSE THE EVIDENCE WAS INSUFFICIENT TO SUPPORT CONVICTION ON THOSE COUNTS. BRIDLE MUST BE DISCHARGED ON THOSE COUNTS.

## ASSIGNMENT OF ERROR IV

THE TRIAL COURT ERRED IN DENYING BRIDLE'S MOTION FOR ACQUITTAL ON THE INTIMIDATION CHARGES IN COUNTS 8 AND 9 BECAUSE THE EVIDENCE WAS INSUFFICIENT TO SUPPORT CONVICTION ON THOSE COUNTS. BRIDLE MUST BE DISCHARGED ON THOSE COUNTS[,] TOO.

{¶28} In his third assignment of error, Bridle contends the trial court erred in denying his motion for a judgment of acquittal on the two counts of pandering obscenity involving a minor. In his fourth assignment of error, Bridle argues that the trial court erred in denying his motion for a judgment of acquittal on the two counts of intimidating a victim in a criminal case.

{¶29} While this Court's resolution of Bridle's first assignment of error mandates reversal, we nonetheless address Bridle's sufficiency challenges to his convictions for pandering obscenity involving a minor and intimidating a victim in a criminal case because of the constitutional protection against double jeopardy. *State v. Lindow*, 9th Dist. Summit No. 27417, 2016-Ohio-913, ¶ 15.

{¶30} Crim.R. 29(A) provides, in relevant part:

The court on motion of a defendant or on its own motion, after the evidence on either side is closed, shall order the entry of a judgment of acquittal of one or more offenses charged in the indictment, information, or complaint, if the evidence is insufficient to sustain a conviction of such offense or offenses. The court may not reserve ruling on a motion for judgment of acquittal made at the close of the state' case.

**{¶31}** When reviewing the sufficiency of the evidence, this Court must review the evidence in a light most favorable to the prosecution to determine whether the evidence before the trial court was sufficient to sustain a conviction. *State v. Jenks*, 61 Ohio St.3d 259, 279 (1991).

> An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

*Id*. at paragraph two of the syllabus.

**{¶32}** During its case-in-chief, the State presented evidence in support of the following narrative. Bridle was jailed after being charged in relation to the events of December 5, 2020. While in jail, Bridle placed several phone calls to a former girlfriend, T.G., and asked her to work with a motorcycle gang in order to create the appearance that B.P. had solicited child pornography. Bridle wrote a letter detailing how T.G. could send B.P. child pornography without being detected. Bridle indicated that T.G. could find images on the dark web or send images of her own children. Bridle instructed T.G. to address the envelope to B.P.'s closest neighbor without putting a name on the envelope. Bridle further directed T.G. to place a typed message to B.P. inside the envelope. After police obtained a warrant based on a jailhouse phone call from Bridle to T.G., police intercepted Bridle's letter to T.G. in the jailhouse mailroom. T.G. testified that Bridle hoped that framing B.P. could help Bridle to either reduce the severity of the charges against him or get the charges dropped. T.G. initially told Bridle that she would not help him. T.G. testified that when Bridle persisted, she told Bridle that she would help but she never actually intended to do so and she never contacted the motorcycle gang.

{¶33} After learning of Bridle's communications with T.G., a victim advocate notified police of another jailhouse call that Bridle placed to a woman named J.M. The contents of the conversation were very similar to Bridle's conversations with T.G. Police subsequently obtained a warrant and intercepted a letter in the jailhouse mailroom that Bridle had sent to J.M. In the letter, Bridle asked J.M. to execute a plan where child pornography would be sent to B.P.'s closest neighbor along with an enclosed letter indicating the package was intended for B.P. Bridle stated in the letter that execution of the plan would be beneficial to his court case.

{¶34} Bridle challenges his convictions for pandering obscenity in violation of R.C. 2907.321(A)(2), which states that "[n]o person, with knowledge of the character of the material or performance involved, shall * * * [p]romote or advertise for sale or dissemination; sell, deliver, disseminate, display, exhibit, present, rent, or provide; or offer or agree to sell, deliver, disseminate, display, exhibit, present, rent, or provide, any obscene material that has a minor or impaired person as one of its participants or portrayed observers[.]

{¶35} Bridle maintains that the trial court erred in denying his motion for a judgment of acquittal because the State failed to prove that he was, at any point, in possession or control of obscene material. Bridle points to the Twelfth District's decision in *State v. Hamrick*, 12th Dist. Madison No. CA2011-01-002, 2011-Ohio-5357, in support of the proposition that possession of obscene material is a necessary element of pandering obscenity pursuant to R.C. 2907.321(A)(2). Bridle stresses that there was never any obscene material at issue in this case.

{¶36} In response, the State asserts that *Hamrick* was wrongly decided because the holding runs afoul of the plain language the statute. The State further points to Ohio's complicity statute which provides that "[n]o person, acting with the kind of culpability required for the

commission of the offense, shall * * * [s]olicit or procure another to commit the offense[.]" R.C. 2923.03(A)(1).

**{¶37}** As an initial matter, we decline to take a position as to whether *Hamrick* was wrongly decided given that this case involves a distinguishable set of facts. *Hamrick* involved a scenario where the defendant downloaded more than 300 images and videos containing child pornography onto his hard drive. *Hamrick* at ¶ 6. At trial, the court concluded that the State had failed to demonstrate that the defendant violated R.C. 2907.321(A)(2) but "found appellant guilty on the 'lesser included offense' of pandering obscenity in violation of R.C. 2907.321(A)(5)." *Hamrick* at ¶ 26. R.C. 2907.321(A)(5) explicitly proscribes possession of obscene material that has a minor as one of its participants. On appeal, the Twelfth District concluded that R.C. 2907.321(A)(5) was a lesser included offense of R.C. 2907.321(A)(2), observing that an individual must "possess or control obscene material in order to promote, advertise, sell, deliver, disseminate, display, exhibit, present, [etc.], the material under R.C. 2907.321(A)(2)." (Internal quotations omitted.) *Hamrick* at ¶ 37-38. The *Hamrick* court did not contemplate a scenario such as this where the defendant hatched a plan to have a third party locate, obtain, and transmit obscene materials.

**{¶38}** The evidence here, even when construed in the light most favorable to the State, was insufficient to convict Bridle of pandering obscenity in violation of R.C. 2907.321(A)(2). The State did not pursue an attempt theory with respect to the pandering obscenity charges. While the State points to the complicity statute, we note that R.C. 2923.03(C) provides that "[n]o person shall be convicted of complicity under this section unless an offense is actually committed[.]" While the evidence shows that Bridle reached out to two women regarding his plan, the evidence suggests that his sinister intentions were never put into action and that this case did not involve obscene

material. The letters that Bridle wrote to the women were intercepted in the jailhouse mailroom. There is no evidence that T.G. and J.M. were willing to cooperate with Bridle and there is nothing in the record indicating that obscene material was ever procured, much less delivered to B.P. Accordingly, we must sustain Bridle's third assignment of error.

{¶39} Bridle further challenges his convictions for intimidating a victim of a crime in violation of R.C. 2921.04(B)(1), which provides that "[n]o person, knowingly and by force or by unlawful threat of harm to any person or property or by unlawful threat to commit any offense or calumny against any person, shall attempt to influence, intimidate, or hinder any * * * victim of a crime * * * in the filing or prosecution of criminal charges[.]"

{¶40} For the reasons set forth in our resolution of Bridle's third assignment of error, we must sustain his fourth assignment of error pertaining to his convictions for intimidating a crime victim. The State failed to demonstrate that this case involved unlawful threats or calumny against B.P. Although the State presented evidence that Bridle devised a scheme aimed at damaging B.P.'s reputation, his plot was thwarted and no calumny ever occurred. Thus, the State's evidence failed to support Bridle's convictions for intimidating a crime victim.

{¶41} Bridle's third and fourth assignments of error are sustained.

### ASSIGNMENT OF ERROR II

BRIDLE'S TRIAL COUNSEL RENDERED CONSTITUTIONALLY DEFICIENT PERFORMANCE WHICH PREJUDICED BRIDLE BY FAILING TO SEEK A MISTRIAL AFTER THE TRIAL COURT, IN THE MIDDLE OF THE DEFENSE CASE, REVERSED ITS EARLIER RULING AND BARRED BRIDLE'S EVIDENCE WHICH HAD BEEN PREVIEWED FOR THE JURY IN OPENING.

### ASSIGNMENT OF ERROR V

THE TRIAL COURT ERRED BY ENTERING JUDGMENTS OF CONVICTION AS TO COUNTS 6-7 (PANDERING OBSCENITY) AND COUNTS 8-9 (INTIMIDATION), AND IN SENTENCING ACCORDINGLY, BECAUSE THE

VERDICT FORMS ON THOSE COUNTS [] – PURSUANT TO R.C. 2945.75(A)(2) – WERE SUFFICIENT ONLY FOR THE LESSER OFFENSES OF FOURTH-DEGREE FELONY PANDERING FOR COUNTS 6[-]7 AND MISDEMEANOR INTIMIDATION FOR COUNTS 8[-]9.

**ASSIGNMENT OF ERROR VI**

THE TRIAL COURT ERRED IN IMPOSING A CONSECUTIVE AND CLOSE-TO-MAXIMUM PRISON SENTENCE OF 24 TO 29 YEARS BECAUSE THAT SENTENCE WAS IMPOSED IN VIOLATION OF OHIO'S MERGER AND SENTENCING LAWS AND WITHOUT CONSIDERATION OF BRIDLE'S SUBSTANTIAL MITIGATION, ALL IN VIOLATION OF BRIDLE'S RIGHTS TO DUE PROCESS, A FAIR SENTENCING PROCEEDING, AND AGAINST DOUBLE JEOPARDY.

**{¶42}** In light of this Court's ruling on Bridle's first, third, and fourth assignments of error, we decline to address his second, fifth, and sixth assignments of error as they have been rendered moot. *See* App.R. 12(A)(1)(c).

III.

**{¶43}** Bridle's first, third, and fourth assignments of error are sustained. We decline to reach the second, fifth, and sixth assignments of error as they have been rendered moot. The judgment of the Medina County Court of Common Pleas is reversed and the cause remanded for further proceedings consistent with this decision.

Judgment reversed,
and cause remanded.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Medina, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellee.

DONNA J. CARR
FOR THE COURT

TEODOSIO, P. J.
SUTTON, J.
CONCUR.

APPEARANCES:

TIMOTHY F. SWEENEY, Attorney at Law, for Appellant.

S. FORREST THOMPSON, Prosecuting Attorney, and VINCENT V. VIGLUICCI, Assistant Prosecuting Attorney, for Appellee.