[Cite as *State v. Parker*, 2024-Ohio-2227.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO | : | JUDGES: |
| | : | |
| | : | Hon. Patricia A. Delaney, P.J. |
| Plaintiff-Appellee | : | Hon. William B. Hoffman, J. |
| | : | Hon. John W. Wise, J. |
| -vs- | : | |
| | : | Case No. 2023CA00053 |
| | : | |
| ZACHARY PARKER | : | |
| | : | |
| | : | |
| Defendant-Appellant | : | O P I N I O N |

CHARACTER OF PROCEEDING:      Appeal from the Stark County Court of
Common Pleas, Case No. 2022CR1915

JUDGMENT:      AFFIRMED

DATE OF JUDGMENT ENTRY:      June 10, 2024

APPEARANCES:

For Plaintiff-Appellee:

KYLE L. STONE
STARK CO. PROSECUTOR
CHRISTOPHER A. PIEKARSKI
110 Central Plaza South, Ste. 510
Canton, OH 44702

For Defendant-Appellant:

GEORGE URBAN
116 Cleveland Ave. NW, Ste. 808
Canton, OH 44702

*Delaney, P.J.*

{¶1}   Appellant Zachary Parker appeals from the April 28, 2023 Judgment Entry of the Stark County Court of Common Pleas.  Appellee is the state of Ohio.

**FACTS AND PROCEDURAL HISTORY**

{¶2}   The following evidence is adduced from the record of appellant's jury trial.

{¶3}  The instant case arose in the late afternoon of July 24, 2022, when John Doe, Mary Roe, and the couple's Grandchild left Maggiore's Drive-Thru on the corner of Wales and Stuhldreher in Jackson Township around 6:00 p.m. John Doe drove the couple's black Hyundai and Mary Roe was in the front passenger seat.

{¶4} The trio left Maggiore's without incident and drove down Stuhldreher, closely followed by a white Jeep with a black grille and black wheels.  The Jeep tailgated Doe's vehicle, close to his bumper all the way down the road. The Jeep was about an inch away from the Hyundai, so close that Doe and Roe could not read its license plate.  Doe believed the Jeep would hit them if he tapped his brakes. Doe admittedly became angry, irritated, and "a little hot" that the Jeep was tailgating them because Grandchild was in the car.  Roe was also concerned and "extremely shaken up," feeling that the Jeep was "too close for comfort."

{¶5}  Doe slowed, activated his turn signal, and turned onto the street he lived on. As the Hyundai turned, the Jeep went around them, into the opposing lane of traffic, and continued straight on Stuhldreher. The driver, identified as appellant, glared at Doe and Roe as he passed, and Doe yelled out the window, "What the fuck?"

{¶6} At their residence, Doe, Roe, and Grandchild exited the Hyundai and Grandchild ran up the driveway toward the house.  Roe noticed the same white Jeep with

black wheels and a black grille coming slowly down their street from Stuhldreher. She recognized the driver as the same man from earlier, and turned away to walk up the driveway. Doe told her to take Grandchild into the house and walked toward the road. As the Jeep passed their driveway, Doe saw appellant reach out of the driver's-side window with a dark gray .9-millimeter firearm in his hand and fire three shots toward Doe, Roe, and Grandchild. Roe did not see the shots fired because her back was turned, but heard three "pops." Roe saw the driver out of the corner of her eye, but was distracted by Grandchild.

{¶7} No one was struck by any bullets. Appellant sped away from the scene in the Jeep.

{¶8} A Neighbor on the same street heard shots and observed a light-skinned male driving a white "boxy" SUV speed past her house. She noticed the driver was white or "tan," bearded, with disheveled hair. Neighbor heard another car revving its engine, ran inside her house, and called 911 immediately.

{¶9} Jackson Township Police arrived on the scene and spoke to Doe and Roe. No damage was found on the Hyundai, nearby vehicles, or the Doe/Roe residence. Two .9-millimeter shell casings were found in the street, within 10 feet of each other. The shell casings were submitted to B.C.I. but were not tested for DNA evidence.

{¶10} The next day, Doe spotted the white Jeep with black wheels and a black grille parked at an apartment complex about a quarter of a mile from his home. Doe flagged down a Jackson Township police officer and told him the Jeep was involved in the shooting the day before. The officer ran the Jeep's license plate, revealing it was owned by K.S., a female.

{¶11} Detective McDannold of the Jackson Township Police Department investigated the shooting and obtained video surveillance footage from a store across the street from Maggiore's Drive-Thru. The video showed the Hyundai pull out of the Maggiore's parking lot, followed by a vehicle matching the description of the white Jeep.

{¶12} A "be on the lookout" (BOLO) was issued for the white Jeep with black wheels and black grille, and for the driver, a white man with facial hair. Around 11:54 a.m. on July 29th, a Massillon police officer observed a Jeep matching the description traveling through downtown Massillon. The Massillon officer initiated a felony traffic stop, aware that the Jeep had been involved in a "shots fired" incident several days earlier. Appellant's girlfriend K.S. was driving the Jeep, and appellant was the passenger. The Massillon officer advised the pair of the BOLO, but they claimed the Jeep had been in a cousin's shop for repair and not in their possession. Appellant said the Jeep was returned to them the previous Saturday, which was one day prior to the shooting.

{¶13} The Massillon officer asked Jackson Township police if they wanted him to seize the vehicle, but Jackson declined because they did not have enough evidence to charge appellant at that time. K.S. permitted the officer to search the vehicle and no relevant evidence was found. The Jeep was released to K.S. and appellant.

{¶14} Later on July 29th, Detective Jeff Aynes of the Jackson Police Department observed a white Jeep, driven by a man matching the BOLO description, between 4:00 and 6:00 p.m. Aynes recognized the Jeep as one he noticed parked in front of Stuhldreher apartments in the past. Aynes followed the Jeep and believed it was attempting to elude him by pulling in and out of various driveways. Dispatch advised the

registered owner of the Jeep was a woman named K.S. and that appellant was also associated with the vehicle.

{¶15} Aynes ran appellant's Social Security number and retrieved a photo of him, confirming that appellant was the man Aynes observed driving the Jeep. The Jeep took off at a high rate of speed but Aynes was stuck behind another vehicle at a traffic light. He lost sight of the Jeep and did not find it again.

{¶16} On August 10th, Jackson police administered photo lineups to John Doe and Mary Roe, separately. Both Doe and Roe identified the photo of appellant as the shooter.

{¶17} McDannold spoke to appellant twice on August 23rd. Appellant first claimed he never drove the Jeep, but then admitted he "sometimes" drives it when confronted with the fact that Aynes witnessed him driving the Jeep. Appellant said he uses the Jeep for quick errands to the store, and mentioned the store near Maggiore's that provided the video surveillance from the date of the incident. Appellant denied any involvement in the shooting, stating he was at work Monday through Friday. McDannold told him the shooting occurred on a Sunday, and appellant said he would have been home with his family.

{¶18} Appellant's girlfriend K.S. was a defense witness at trial. She testified that appellant drove her Jeep to pick up pizza around 5:00 p.m. on July 24, 2022. K.S. admitted appellant was under the influence of cocaine, "weed," and alcohol around that time because his grandmother had recently passed away. She testified appellant returned from the errand seeming nervous and even "terrified," and said they had to leave their apartment because someone just shot at him because he owed money for drugs.

Appellant told K.S. he bought coke from "Tommy" and went to pay him $500, but was shot at. Appellant, K.S., and their children hurriedly left their apartment and later returned around midnight.

{¶19} K.S. claimed they were awakened the next morning by an older, heavyset white male named "Tommy" banging on their front door. Appellant told her it was his coke dealer demanding $500, and appellant gave him $60 to go away.

{¶20} Detective McDannold testified appellant never said anything about a drug debt or claimed that anyone shot at him. Appellant made two recorded phone calls while in jail awaiting trial in which he admitted lying about driving the Jeep and another unspecified lie.

{¶21} Appellant was charged by indictment with three counts of discharge of a firearm on or near a prohibited premises pursuant to R.C. 2923.162(A)(3)(C)(2), all felonies of the third degree and accompanied by firearm specifications pursuant to R.C. 2941.145(A); one count of having a weapon while under disability pursuant to R.C. 2923.13(A)(2)(B), a felony of the third degree; one count of improperly handling firearms in a motor vehicle pursuant to R.C. 2923.16(A)(I), a felony of the fourth degree; and one count of aggravated menacing pursuant to R.C. 2903.21(A)(B), a misdemeanor of the first degree. Appellant entered pleas of not guilty.

{¶22} Appellant filed a motion to suppress his statements to police and an evidentiary hearing was held. The following evidence is adduced from the record of the suppression hearing.

{¶23} Detective McDannold was assigned to investigate the shooting that occurred on July 24, 2022. He first interviewed appellant at the Canton Municipal Court

Probation Department and Mirandized him. Appellant asked for an attorney several minutes into the interview.

{¶24} Appellant was arrested and transported to the Stark County Jail by Officer Minarcheck while McDannold remained behind.

{¶25} Appellant and Minarcheck had a wide-ranging conversation on their way to the Stark County Jail about sports, appellant's family, and his future plans. Minarcheck advised appellant to turn his life around and to get his driver's license back. Minarcheck was aware appellant had invoked his right to counsel and did not question him about the case. Minarcheck testified the purpose of the conversation was a "threat assessment" to ensure appellant was not a suicide risk and would not attempt to harm himself at the jail. Minarcheck was not an investigator on appellant's case and knew nothing about it, other than it involved serious charges. When appellant attempted to ask Minarcheck about the case, the officer told him to talk to his attorney and follow his advice.

{¶26} Eventually appellant asked Minarcheck, "Why can't I talk to you guys?" and the officer responded, "Because you invoked your *Miranda*." Minarcheck explained appellant would have to complete a waiver form if he truly changed his mind and wanted to speak to detectives about the case. Appellant indicated, without prompting, that he wanted to speak to McDannold again, so Minarcheck contacted the detective and told him to meet them at the jail.

{¶27} At the jail, McDannold confirmed appellant initiated the conversation and sought to speak to the detective; appellant responded, "Yeah, I want to speak to you." McDannold confirmed no one promised appellant anything or threatened him. Appellant said, "Okay. I volunteer. I'll speak to you." McDannold Mirandized appellant again;

appellant indicated he understood those rights; and McDannold again confirmed appellant still wanted to talk. McDannold asked appellant what he wanted to talk about, and appellant responded, "I wanna talk to you about the shooting that you said occurred." Appellant then provided a statement about the incident.

{¶28} McDannold testified appellant was apprised of all of his rights and his statements to police were voluntary. McDannold testified appellant voluntarily waived his *Miranda* rights, was not promised anything in return for his statement, and was not threatened or coerced.

{¶29} On March 29, 2023, the trial court overruled appellant's suppression motion by judgment entry.

{¶30} The matter proceeded to trial by jury. Appellant was found guilty as charged except for one count of discharge of a firearm on or near a prohibited premises, of which he was acquitted. At a subsequent sentencing hearing, the trial court imposed a total aggregate prison term of 9 years.

{¶31} Appellant now appeals from the judgment entry of conviction and sentence, incorporating the trial court's entry overruling his motion to suppress.

{¶32} Appellant raises two assignments of error:

**ASSIGNMENTS OF ERROR**

{¶33} "I. THE TRIAL COURT ERRED IN NOT GRANTING THE APPELLANT'S MOTION TO SUPPRESS."

{¶34} "II. APPELLANT'S CONVICTIONS WERE AGAINST THE MANIFEST WEIGHT AND SUFFICIENCY OF THE EVIDENCE."

**ANALYSIS**

I.

{¶35} In his first assignment of error, appellant argues the trial court should have granted his motion to suppress.  We disagree.

{¶36} Appellate review of a trial court's decision to deny a motion to suppress involves a mixed question of law and fact.  *State v. Long*, 127 Ohio App.3d 328, 332, 713 N.E.2d 1 (4th Dist.1998). During a suppression hearing, the trial court assumes the role of trier of fact and, as such, is in the best position to resolve questions of fact and to evaluate witness credibility.  *State v. Brooks*, 75 Ohio St.3d 148, 154, 661 N.E.2d 1030 (1996). A reviewing court is bound to accept the trial court's findings of fact if they are supported by competent, credible evidence.  *State v. Medcalf*, 111 Ohio App.3d 142, 145, 675 N.E.2d 1268 (4th Dist.1996).  Accepting these facts as true, the appellate court must independently determine as a matter of law, without deference to the trial court's conclusion, whether the trial court's decision meets the applicable legal standard.  *State v. Williams*, 86 Ohio App.3d 37, 42, 619 N.E.2d 1141 (4th Dist.1993), overruled on other grounds.

{¶37} There are three methods of challenging a trial court's ruling on a motion to suppress on appeal. First, an appellant may challenge the trial court's finding of fact. In reviewing a challenge of this nature, an appellate court must determine whether the trial court's findings of fact are against the manifest weight of the evidence. See, *State v. Fanning*, 1 Ohio St.3d 19, 437 N.E.2d 583 (1982); *State v. Klein*, 73 Ohio App.3d 486, 597 N.E.2d 1141 (4th Dist.1991). Second, an appellant may argue the trial court failed to apply the appropriate test or correct law to the findings of fact.  In that case, an appellate

court can reverse the trial court for committing an error of law. See, *Williams*, supra. Finally, an appellant may argue the trial court has incorrectly decided the ultimate or final issues raised in a motion to suppress. When reviewing this type of claim, an appellate court must independently determine, without deference to the trial court's conclusion, whether the facts meet the appropriate legal standard in any given case. *State v. Curry*, 95 Ohio App.3d 93, 96,620 N.E.2d 906 (8th Dist.1994).

{¶38} Appellant argues he was coerced into waiving his *Miranda* rights and making statements to Minarcheck and McDannold. Specifically, he asserts he was "manipulated and pressured to fe[e]l guilty" by Minarcheck, thus his statements were unreliable and his waiver of *Miranda* was ineffective.

{¶39} There is no dispute appellant was in custody when he spoke to Minarcheck on the way to the jail, and then to McDannold at the jail. To use a statement made by the accused during a custodial interrogation, the prosecution must show: "(1) the accused, prior to any interrogation, was given the *Miranda* warnings; (2) at the receipt of the warnings, or thereafter, the accused made 'an express statement' that he desired to waive his *Miranda* constitutional rights; (3) the accused effected a voluntary, knowing, and intelligent waiver of those rights." *State v. Edwards*, 49 Ohio St.2d 31, 38, 358 N.E.2d 1051 (1976), abrogated on other grounds, citing *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

{¶40} When McDannold first made contact with appellant at the Canton Municipal Court, appellant immediately invoked his right to counsel. If an accused in custody has clearly asserted his right to counsel during a police interview, questioning must cease until counsel has been made available to him or the accused initiates further conversation.

*Davis v. U.S.*, 512 U.S. 452, 458, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994); *Edwards v. Arizona*, 451 U.S. 477, 484–485, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). This "rigid prophylactic rule" embodies two distinct inquiries. *Smith v. Illinois*, 469 U.S. 91, 94–95, 105 S.Ct. 490, 83 L.Ed.2d 488 (1984). First, courts must determine whether the accused actually invoked his right to counsel. *Id.* citing *Edwards,* 451 U.S. at 484–485; *Miranda*, 384 U.S. 436, 444–445. Second, if an accused has invoked his right to counsel, the court may admit his responses to further questioning only if (1) he initiated further discussions with the police, and (2) he knowingly and intelligently waived the right he had invoked. *Smith* citing *Edwards,* at 485–486.  In the instant case, appellant re-initiated conversation with McDannold upon his arrival at the Stark County Jail.

{¶41} Appellant argues his second conversation with McDannold was coerced by Minarcheck. Even if appellant has ultimately waived his right to counsel, any confession or admission must be voluntary. In order to be voluntary, a confession must be the product of a rational intellect and free will. In *State v. Wesson*, 137 Ohio St.3d 309, 2013-Ohio-4575, 999 N.E.2d 557, ¶ 34-35, the Supreme Court of Ohio set forth the following test:

> When a suspect is questioned in a custodial setting, the Fifth Amendment requires that he receives *Miranda* warnings to protect against compelled self-incrimination. *Miranda* at 478-479, 86 S.Ct. 1602, 16 L.Ed.2d 694. A suspect may then knowingly and intelligently waive these rights and agree to make a statement. *Id.* at 479, 86 S.Ct. 1602, 16 L.Ed.2d 694. If a defendant later challenges a confession as involuntary, the state must prove a knowing, intelligent, and voluntary waiver by a preponderance of evidence.

See *Id.* at 475, 86 S.Ct. 1602, 16 L.Ed.2d 694; *Colorado v. Connelly*,

479 U.S. 157, 168-169, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986).

{¶42} To determine whether a valid waiver occurred, we "consider the totality of the circumstances, including the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement." *Edwards*, supra, 49 Ohio St.2d 31, paragraph two of the syllabus.

{¶43} In the instant case, appellant asserts he invoked his right to counsel during his first conversation with McDannold, and argues he did not open the door to further interrogation during his conversation with Minarcheck. Appellee responds that appellant has tweaked his argument on appeal because he did not claim coercion by Minarcheck or involuntary waiver at the Stark County Jail in the suppression hearing before the trial court, and has therefore waived those issues on appeal. Our review of the suppression hearing indicates the broad issue addressed by both parties was whether appellant's statements to McDannold at the jail were voluntary and the evidence presented covers the narrower issues appellant now raises on appeal. Appellee's evidence at the two-part suppression hearing included the testimony of McDannold and Minarcheck, and videos of both officers' conversations with appellant, including appellant's conversation in Minarcheck's vehicle for transport to the jail.

{¶44} Appellant does not explain how Minarcheck coerced him into making a statement, other than implying Minarcheck made him feel guilty about the direction his life had taken. We find no evidence of coercion. When appellant was arrested at Canton Municipal Court, he said he wanted to talk to his attorney and questioning immediately

ceased. He was transported to the Stark County Jail in Minarcheck's patrol car; the conversation in the car does not directly address the instant case and ranged from the high school both attended, to sports, to the benefits of living in Jackson Township. Minarcheck generally urged appellant to turn his life around, and appellant questioned Minarcheck about the evidence against him. Minarcheck responded generally that appellant should talk to his attorney because appellant risked returning to prison.

{¶45} Even when appellant brought up the instant charges, implying someone else was driving his girlfriend's Jeep, Minarcheck repeatedly told him to talk to his attorney. Eventually appellant asked, "Why can't I talk to you guys?" and Minarcheck told him he would have to fill out a "special form," i.e. a waiver of his Miranda rights. Minarcheck further told appellant he would have to discuss the matter with the detective, not with Minarcheck. Appellant responded that yes, he wanted to speak to the detective, and Minarcheck called McDannold to advise appellant wanted to speak to him again.

{¶46} McDannold testified that when he received Minarcheck's call, he checked with the Stark County Prosecutor's Office whether he could talk to appellant after he invoked his right to counsel, and was told it was permissible to speak to appellant again if he repeated the *Miranda* warnings and made it clear appellant initiated the second conversation. Appellee presented videotape evidence of McDannold confirming appellant understood no promises or threats were made and he wasn't under duress. Appellant acknowledged he understood, and that he understood his rights pursuant to *Miranda*. He then proceeded to make a voluntary statement to McDannold about the case.

{¶47} The Supreme Court defined "coercion" in *State v. Belton*,

This court may find coercion when law-enforcement officers "persuad[e] or deceiv[e] the accused, with false promises or information, into relinquishing his rights and responding to questions." *Edwards*, 49 Ohio St.2d at 39, 358 N.E.2d 1051. However, "the presence of promises does not as a matter of law, render a confession involuntary." *Id.* at 41, 358 N.E.2d 1051. Officers may discuss the advantages of telling the truth, advise suspects that cooperation will be considered, or even suggest that a court may be lenient with a truthful defendant. *Id.* And "[a]dmonitions to tell the truth are considered to be neither threats nor promises." *State v. Loza*, 71 Ohio St.3d 61, 67, 641 N.E.2d 1082 (1994); *see also State v. Dixon*, 101 Ohio St.3d 328, 2004-Ohio-1585, 805 N.E.2d 1042, ¶29.

149 Ohio St.3d 165, 2016-Ohio-1581, 74 N.E.3d 319, ¶ 111.

{¶48} Appellant points to no such evidence of coercion in the instant case. The record does not support the appellant's allegation of coercion by law enforcement. *State v. Jarvis*, 5th Dist. Stark No. 2023CA00039, 2024-Ohio-534, ¶ 47. Under the totality of the circumstances, the record supports the trial court's conclusion that the appellant knowingly, intelligently and voluntarily waived his *Miranda* rights and his statements to law-enforcement were made voluntarily.

{¶49} In *State v. Knuckles,* 65 Ohio St.3d 494, 1992-Ohio-64, the Ohio Supreme Court found that, "[o]nce an accused invokes his right to counsel, all further custodial interrogation must cease and may not be resumed in the absence of counsel unless the

accused thereafter effects a valid waiver or himself renews communication with the police." *Knuckles* at paragraph one of the syllabus. We find, as did the trial court, that appellant's statements to Minarcheck initiated the second conversation with McDannold. *State v. Loeffler*, 5th Dist. Guernsey No. 05 CA 45, 2006-Ohio-5215, ¶ 31.

{¶50} Therefore, we find that appellant's constitutional rights were not violated when appellant was questioned after he initially exercised his right to counsel. *Id.* As to whether appellant waived his right to counsel, we find that appellant was informed of his rights in detail, including his right to counsel, and waived those rights. Further, we find that the record reflects that appellant understood his rights, including his right to have counsel present, and clearly chose to waive his rights and speak with McDannold without counsel. *Id.* McDannold fully advised appellant of his rights again. The record reflects that appellant was aware that he had a right to have counsel present and chose to waive that right. We further find that, upon reviewing the totality of the circumstances, appellant's statements to police were given freely and voluntarily. *Id.*

{¶51} Finally, appellant argues the trial court should have made findings of fact and conclusions of law regarding its decision overruling his motion to suppress. Pursuant to Crim.R. 12(F), "[w]here factual issues are involved in determining a motion, the court shall state its essential findings on the record." In order to invoke this provision, a defendant must request the trial court to state its findings of fact on the record. However, Crim.R. 12(E) does not control if appellant did not request factual findings. *State v. Eley*, 77 Ohio St.3d 174, 179, 672 N.E.2d 640 (1996), abrogated on other grounds by *State v. Wesson*, 137 Ohio St.3d 309, 2013-Ohio-4575, 999 N.E.2d 557. To invoke the rule, the defendant must request that the court state its essential findings of fact in support of its

denial of a motion, and failure to invoke the rule waives any error. *Id.,* internal citations omitted.  In the instant case, appellant did not request findings of fact and conclusions of law.  Moreover, our review of the record of the suppression hearing provided an adequate basis to determine the rationale underlying the trial court's decision overruling the motion to suppress.

{¶52} Appellant's first assignment of error is overruled.

II.

{¶53} In his second assignment of error, appellant argues his convictions are not supported by sufficient evidence and are against the manifest weight of the evidence.  We disagree.

{¶54} The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different.  *State v. Thompkins*, 78 Ohio St.3d 380, 1997-Ohio-52, 678 N.E.2d 541, paragraph two of the syllabus. The standard of review for a challenge to the sufficiency of the evidence is set forth in *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991) at paragraph two of the syllabus, in which the Ohio Supreme Court held, "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."

{¶55} In determining whether a conviction is against the manifest weight of the evidence, the court of appeals functions as the "thirteenth juror," and after "reviewing the

entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be overturned and a new trial ordered." *State v. Thompkins*, supra, 78 Ohio St.3d at 387. Reversing a conviction as being against the manifest weight of the evidence and ordering a new trial should be reserved for only the "exceptional case in which the evidence weighs heavily against the conviction." *Id.*

{¶56} First, appellant argues his convictions are against the manifest weight and sufficiency of the evidence because the verdicts are inconsistent; he argues it is unreasonable and inconsistent for the jury to find him guilty "of some charges, but not others." Appellant's summary argument does not explain his reasoning or even which verdicts are allegedly flawed; presumably he refers to the convictions upon two counts of discharge of a firearm on or near prohibited premises pursuant to R.C. 2923.162(A)(3)(C)(2). Appellant was charged with three counts, found guilty upon two, and acquitted upon one.

{¶57} R.C. 2923.162(A)(3)(C)(2) states in pertinent part, "No person shall [d]scharge a firearm upon or over a public road or highway [and] shall be punished as follows: if the violation created a substantial risk of physical harm to any person or caused serious physical harm to property, a violation of division (A)(3) of this section is a felony of the third degree." Appellant was charged with three counts, one for each victim: John Doe, Mary Roe, and Grandchild. The jury's decision may reflect a determination that two shots were fired because two shell casings were found, or that John Doe and Mary Roe were placed at substantial risk of physical harm by the shots in the driveway, but

Grandchild's position was unclear and not at risk of serious physical harm. Either way, the jury's conviction of two counts and acquittal of one does not create an inconsistent verdict.

{¶58} The apparent inconsistency in convicting appellant upon two counts and acquitting him upon another, for the same conduct, does not create a fatally "inconsistent verdict." We have previously cited the Ohio Supreme Court's decision in *State v. Lovejoy*, 79 Ohio St.3d 440, 683 N.E.2d 1112 (1997) at paragraph one of the syllabus, holding that "several counts of an indictment containing more than one count are not interdependent and an inconsistency in a verdict does not arise out of inconsistent responses to different counts, but only arises out of inconsistent responses to the same count." *State v. Kelley*, 5th Dist. Delaware No. 2006CA00371, 2007-Ohio-6517, ¶ 24 [inconsistent responses to different counts do not create an inconsistency in the verdicts]. The instant case does not present inconsistent responses to the same count. *State v. Nesbitt*, 5th Dist. Stark No. 2017CA00234, 2018-Ohio-4222, ¶ 30.

{¶59} Furthermore, an inconsistent verdict may very well be a result of leniency and compromise by the jurors, rather than being caused by jury confusion. *State v. King*, 5th Dist. Guernsey No. 09 CA 000019, 2010-Ohio-2402, ¶ 33, citing *State v. Fraley,* 5th Dist. Perry No. 03CA12, 2004–Ohio–4898, ¶ 15, internal citation omitted. An inconsistent-verdict argument arising from separate counts in an indictment does not establish that a verdict is against the manifest weight of the evidence. See, *King*, supra, 2010-Ohio-2402, ¶ 34.

{¶60} Finally, appellant summarily asserts appellee presented insufficient evidence "of the crimes alleged" because "[n]othing in the home hit (*sic*); police never

searched any home for weapons and none were found; [n]o DNA, fingerprints, residue, evidence of value were found by police (*sic*)." Brief, 20. We disagree.

{¶61} In addition to the counts of discharge of a firearm on or near prohibited premises described supra, appellant was found guilty upon one count of having weapons while under disability pursuant to R.C. 2923.13(A)(2) and (B), which prohibits anyone previously convicted of a felony offense of violence from knowingly acquiring, having, carrying, or using a firearm, unless relieved from disability under law. Appellant stipulated he has a prior conviction of a felony offense of violence. Appellant was convicted of one count of improperly handling firearms in a motor vehicle pursuant to R.C. 2923.13(A)(1), which prohibits knowingly discharging a firearm while in or on a motor vehicle. Appellant was convicted of one count of aggravated menacing pursuant to R.C. 2903.21(A) and (B), which prohibits knowingly causing another to believe that the offender will cause serious physical harm to the person or property of another person or a member of the other person's family. Finally, appellant was found guilty upon two firearms specifications pursuant to R.C. 2941.145(A), which prohibits having a firearm on or about the offender's person or under the offender's control while committing the offense and displaying the firearm, brandishing it, indicating that the offender possesses it, or using it to facilitate the offense.

{¶62} Appellee's evidence established appellant was identified by John Doe and Mary Roe as the person who tailgated them while driving a white Jeep as they pulled out of Maggiore's Drive-Thru. Surveillance footage from a nearby store showed the white Jeep following the victims' vehicle. After the victims arrived home and exited their vehicle, as they walked toward their residence with their grandchild, appellant reappeared in the

white Jeep and John Doe saw him fire a gun out the window, in the direction of the three victims. The shots were overheard by Neighbor, who called 911. Two shell casings were later found in the street. John Doe and Mary Roe identified appellant in photo lineups and in the courtroom at trial. Although appellant denied driving the white Jeep on the night in question, his girlfriend testified he drove it to pick up a pizza that night, and came home very nervous and flustered, claiming a drug dealer shot at him three times.

{¶63} Appellant does not reveal which element appellee failed to prove, and we decline to make his argument for him. The weight of the evidence and the credibility of the witnesses are determined by the trier of fact. *State v. Yarbrough*, 95 Ohio St.3d 227, 231, 2002-Ohio-2126, 767 N.E.2d 216, ¶ 79. The jury as the trier of fact was free to accept or reject any and all of the evidence offered by the parties and assess the witness's credibility. "While the trier of fact may take note of the inconsistencies and resolve or discount them accordingly * * * such inconsistencies do not render defendant's conviction against the manifest weight or sufficiency of the evidence." *State v. Craig,* 10th Dist. Franklin No. 99AP–739, 1999 WL 29752 (Mar 23, 2000) *citing State v. Nivens*, 10th Dist. Franklin No. 95APA09–1236, 1996 WL 284714 (May 28, 1996). Indeed, the trier of fact need not believe all of a witness' testimony, but may accept only portions of it as true. *State v. Raver*, 10th Dist. Franklin No. 02AP-604, 2003-Ohio-958, 2003 WL 723225, ¶ 21, *citing State v. Antill*, 176 Ohio St. 61, 67, 197 N.E.2d 548 (1964); *State v. Burke*, 10th Dist. Franklin No. 02AP-1238, 2003-Ohio-2889, 2003 WL 21291042, *citing State v. Caldwell*, 79 Ohio App.3d 667, 607 N.E.2d 1096 (4th Dist. 1992).

{¶64} Here, the jury heard the witnesses and viewed the evidence. In addition, the jury heard the arguments and appellant's own explanations of his actions. Thus, a rational basis exists in the record for the jury's decision.

{¶65} We find that this is not an "'exceptional case in which the evidence weighs heavily against the convictions.'" *State v. Thompkins*, 78 Ohio St.3d 380, 386–387, 678 N.E.2d 541 (1997), internal citation omitted. Appellant's convictions are not against the sufficiency or the manifest weight of the evidence. To the contrary, the jury appears to have fairly and impartially decided the matters before them. The jury heard the witnesses, evaluated the evidence and was convinced of appellant's guilt. The jury neither lost their way nor created a miscarriage of justice in convicting appellant of the offenses.

{¶66} Finally, upon careful consideration of the record in its entirety, we find that there is substantial evidence presented which if believed, proves all the elements of the offenses with which appellant was charged and found guilty.

{¶67} Appellant's second assignment of error is overruled.

## CONCLUSION

{¶68} Appellant's two assignments of error are overruled and the judgment of the Stark County Court of Common Pleas is affirmed.


By: Delaney, P.J.,

Hoffman, J. and

Wise, J., concur.